*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0381p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JO ANN ALLEN and DEBRA SLONE,
　　　　　　　　　*Plaintiffs-Appellants,*

TAMMY DAVIS, Individually and as Next Friend of
Emily Davis,
　　　　　　　　　*Plaintiff,*

　　*v.*

HIGHLANDS HOSPITAL CORPORATION,
　　　　　　　　　*Defendant-Appellee.*

No. 07-6414

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
Nos. 04-00269; 05-00040 —Gregory F. Van Tatenhove, District Judge.

Argued: September 15, 2008

Decided and Filed: October 21, 2008

Before: GILMAN, KETHLEDGE, and ALARCÓN, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Earl M. McGuire, Prestonburg, Kentucky, for Appellants. Vincent Candiello, POST & SCHELL, Harrisburg, Pennsylvania, for Appellee. **ON BRIEF:** Earl M. McGuire, Prestonburg, Kentucky, for Appellants. Vincent Candiello, POST & SCHELL, Harrisburg, Pennsylvania, for Appellee.

---

## OPINION

---

　　RONALD LEE GILMAN, Circuit Judge. Jo Ann Allen and Debra Slone (collectively the plaintiffs) sued their employer, Highlands Hospital Corporation (HHC or the Hospital), for age discrimination under the Age Discrimination in Employment Act (ADEA) and the Kentucky Civil Rights Act (KCRA). In November 2003, both women were terminated after they allegedly violated HHC's confidentiality policy. HHC determined that Allen and Slone had breached the

---

[*]The Honorable Arthur L. Alarcón, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1

confidentiality of one of its patients, Allen's minor granddaughter, by permitting the removal of the girl's x-rays from the Hospital without written authorization from the girl's mother.

Allen and Slone each filed a state-court action against HHC. They claimed that the Hospital's stated reason for discharging them was a pretext designed to hide age discrimination. Both cases were removed to federal district court and consolidated for trial. HHC subsequently filed a motion for summary judgment, which the court granted. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

## A.　Factual background

### 1.　*Allen's and Slone's terminations*

Allen was hired by the Hospital in 1977. She worked in various nursing and supervisory positions until her termination. Slone was hired in 1987 to work as a transcriptionist in the radiology department, where she was responsible for filing, typing, and working at the front desk of the department. At the time of their terminations, Allen and Slone were 63 and 53 years old, respectively.

Emily Davis, Tammy Davis's 10-year-old daughter and Allen's granddaughter, injured her left arm on Wednesday, October 29, 2003. Allen picked up Emily from school and urged Tammy Davis to take the child to the emergency room. Davis complied by taking her daughter to the emergency room at the Hospital, where x-rays were taken of Emily's arm. She then made an appointment for Emily to see a doctor the following Monday. Although Davis was told to pick up Emily's x-rays before leaving the Hospital in order to have them for the appointment, she forgot to do so.

Having realized that she forgot the x-rays, Davis asked Allen to pick them up while Allen was at work on Friday, even though Davis had not signed a release permitting Allen to obtain the records. The next morning, Allen went to the radiology department in order to retrieve the x-rays. She was told by a member of the radiology department that she could not get a copy of the x-rays without a signed release form. Despite being informed that releasing the x-rays without proper authorization would violate the Health Insurance Portability and Accountability Act of 1996 (HIPAA), a statute protecting patient privacy, Allen continued her efforts to retrieve the films. She was ultimately able to get a copy of the x-rays from Slone.

Allen later signed Davis's name on a release form, backdated the document, and put it in the x-ray jacket. Throughout the course of this litigation, Allen has maintained that her actions did not constitute a "forgery" because she had Davis's oral permission to sign the release. Davis, however, did not recall whether she had given Allen permission to sign her name, but she did give Allen permission to pick up the x-rays.

HHC investigated Allen's and Slone's conduct for breach of patient privacy. Harold Warman, the President and CEO of HHC, decided to terminate the plaintiffs based on the recommendation of the Hospital's Vice President of Human Resources. The Hospital has maintained that Allen's and Slone's policy violation constituted a "Group I" offense, the worst category of offenses that an employee can commit, and one that authorizes termination upon the first infraction.

Warman, however, could not remember the exact details of the policy and conceded that, in an emergency situation, verbal authorization might be allowed. Other employees also stated that they did not know whether there was a written policy detailing how authorization for the release of

medical records was to be obtained, and no written policy of this type appears in the record. But every HHC official involved in the disciplinary process agreed that Allen and Slone had committed a Group I offense and should be terminated.

### 2. *HHC's cost-cutting strategies and employee-turnover rates*

Warman became the President and CEO of HHC in 1998. Soon after he arrived at HHC, he implemented a series of measures to cut costs at the Hospital. Mary Jarvis, a budget manager who reported to Warman, testified that these cost-cutting measures included increasing employee turnover, reducing the amount of sick and vacation time used by employees, closing departments, eliminating positions, and using fewer staff members per shift than had previously been required.

Jarvis also said that one of Warman's strategies was to terminate employees based on seniority to facilitate the hiring of new, less costly employees. In fact, Warman increased the annual turnover rate from 2% to 28%. Jarvis did not know whether the cost-cutting measures had a disproportionate effect on older employees, but she said that Warman's focus was at all times on improving HHC's financial situation.

As the district court noted, the cost-cutting measures implemented by Warman "did not necessarily disproportionately affect" older employees at the Hospital. HHC's expert presented the following statistics reflecting the change in the Hospital's workforce from the time that Warman became CEO in 1998 through the end of 2004:

| Date | Total Number of Employees | Employees Age 40 and Older | Employees Younger than Age 40 |
|---|---|---|---|
| July 1998 | 672 | 273 | 399 |
| December 2002 | 488 | 253 | 235 |
| December 2004 | 530 | 267 | 263 |

The district court summarized this data as follows:

> [F]rom 1998 to 2004, there was a decrease of 136 employees in the under forty category and a decrease of six employees in the forty or over . . . category. Just under 89% of the 184 employees terminated or leaving HHC from 1998 until 2002 were under forty, and if the longer time period is examined, from 1998 to 2004, just over 95% of employee loss took place within the under forty category. The percentage of those employed within the forty and over class rose from just over 40% to just over 51% and back down to just over 50% from 1998 to 2002 to 2004, respectively.

## B. Procedural background

Allen filed a charge with the Equal Employment Opportunity Commission (EEOC) in December 2003, claiming that HHC had violated the ADEA by discharging her on the basis of her age. She received a Right to Sue Letter in April 2004 and filed suit in a Kentucky state court three months later. In addition to the age-discrimination claim, Allen also brought state-law claims for emotional distress, defamation, and wrongful discharge.

Slone filed an EEOC charge in June 2004. Like Allen, Slone contended that she had been discharged because of her age. Slone received an EEOC Right to Sue Letter in October 2004. In February 2005, she filed suit in a Kentucky state court, alleging that HHC had violated both federal and state law by discriminating against her on the basis of her age.

HHC removed both suits to the appropriate federal district court, where the cases were consolidated for trial. Following a substantial period of discovery, the Hospital moved for summary judgment. The district court granted the motion in March 2007, concluding that Allen's and Slone's disparate-treatment and disparate-impact claims were without merit. With respect to their disparate-treatment claim, the district court determined that Allen and Slone had failed to demonstrate that HHC's legitimate, nondiscriminatory explanation for their terminations—their alleged violation of patient privacy—was pretextual. In particular, the court explained that the plaintiffs had failed to produce circumstantial evidence that the motivating factor behind the Hospital's action was based on their age.

As for the disparate-impact claim, the court explained that the plaintiffs had failed to identify a sufficiently specific practice that disproportionately disadvantaged HHC's older employees. The court also concluded that the Hospital's goal of cutting costs by increasing turnover and discouraging employees from using sick and vacation time was not unlawful. This timely appeal followed.

## II. ANALYSIS

### A.     Standard of review

This court reviews de novo the district court's grant of summary judgment as to Allen's and Slone's disparate-treatment and disparate-impact claims. *See Int'l Union v. Cummins*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.     Disparate treatment

#### 1. *Framework for disparate-treatment claims brought under the ADEA*

Under both the ADEA, 29 U.S.C. § 623, and the KCRA, Ky. Rev. Stat. Ann. § 344.040(1), employers are prohibited from discharging or otherwise discriminating against any employee with respect to compensation, terms, conditions, or privileges of employment because of that individual's age. Claims brought under the KCRA are "analyzed in the same manner" as ADEA claims. *Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 531 & n.3 (6th Cir. 2006); *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984) (explaining that because "[t]he Kentucky age discrimination statute is specially modeled after the Federal law . . . ., in this particular area we must consider the way the Federal act has been interpreted," and applying federal caselaw to the plaintiff's KCRA claim).

A plaintiff who brings an age-discrimination claim based on a disparate-treatment theory "must prove that age was a determining factor in the adverse employment action that the employer took against him." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) ("When a plaintiff alleges disparate treatment, liability depends on whether . . . . the plaintiff's age . . . actually played a role in the

employer's decisionmaking process and had a determinative influence on the outcome." (brackets, citations, and internal quotation marks omitted)). Such a claim may be proved using either direct or circumstantial evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

Where a claim of age discrimination is based largely on circumstantial evidence, we analyze the claim under the three-step *McDonnell Douglas* framework. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The first step of the *McDonnell Douglas* test requires the plaintiff to establish a prima facie case of age discrimination by showing that the plaintiff (1) was a member of a protected class of persons (i.e., persons 40 years of age or over), (2) was discharged, (3) was qualified for the position held, and (4) was replaced by someone outside of the protected class. *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005).

"Once a plaintiff satisfies his or her prima facie burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Ercegovich*, 154 F.3d at 350. "If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's nondiscriminatory explanation is a mere pretext for intentional age discrimination." *Id.*

### 2. Direct evidence

Although their brief is somewhat unclear on this point, Allen and Slone appear to claim that they produced direct evidence of age discrimination. They point to (1) Jarvis's statements about the cost-cutting measures implemented by Warman, and (2) the testimony of another employee in the protected class whose supervisor made age-related comments to her in advance of her subsequent termination.

The plaintiffs characterize Jarvis's statements as an expression of "Warman's intent . . . to replace older employees with younger, cheaper employees." That characterization, however, is substantially misleading. In fact, Jarvis said that Warman endeavored to target employees based on *seniority*, not age. As will be discussed in more detail in Part II.D. below, that distinction matters a great deal. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"). Jarvis's testimony, in any event, simply does not constitute "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *See Wexler*, 317 F.3d at 570 (internal quotation marks omitted). The district court agreed.

Allen and Slone also claimed that a comment made to another employee at HHC provided direct evidence of age discrimination. That comment was made to an older employee by her supervisor, who told her to look for a new job because "I think all older employees are going to be let go." But as the district court noted, "[t]he solitary remark regarding an attitude toward age was made by an employee of Aramark/Service Master within the context of an Aramark/Service Master employee and not by Slone's or Allen's supervisors or in the context of their termination." This type of evidence is not sufficient to create a genuine issue of material fact as to whether age was a motivating factor in the decision to terminate Allen and Slone. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994) (explaining that when examining "statements allegedly showing employer bias" on the basis of age, courts should "consider[] whether the comments were

made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination").

### 3. *Circumstantial evidence*

Allen and Slone further contend that they produced sufficient circumstantial evidence of disparate treatment based on age to send their case to a jury. As the district court noted, HHC does not dispute that Allen and Slone satisfied their initial production burden of establishing a prima facie case of age discrimination. The district court also concluded that "it is undisputed that HHC has proffered a legitimate, nondiscriminatory reason for [Allen's and Slone's] termination." It therefore limited its analysis to whether Allen and Slone had produced evidence sufficient for a jury to conclude that the Hospital's proffered reason was a pretext to hide unlawful discrimination on the basis of age.

On appeal, Allen and Slone contest the district court's finding that HHC had proffered a legitimate, nondiscriminatory reason for its termination decisions. They claim that because "the record is clear in showing that no Group I offense was committed, HHC was not properly found to have met" its burden of proof as to the legitimate, nondiscriminatory reason. Allen and Slone attempt to buttress their position by claiming that the Hospital's proffered reason "should properly have been found pretextual" because, according to them, the Hospital's "claim of a Group I violation was patently false and completely unsupported by the record."

The plaintiffs' contention that HHC failed to meet its production burden lacks merit because HHC produced evidence sufficient for a trier of fact to conclude that Allen and Slone were fired for "giving out unauthorized or confidential information about patients," which is explicitly prohibited by the Hospital's employee manual. That Allen and Slone believe this proffered reason to be "patently false" does not lead to the conclusion that the Hospital failed to meet its production burden. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons."); *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (holding that the employer met its production burden "by alleging that Tinker's termination was the result of his violation of company policy on the preparation of work orders"). Rather, the plaintiffs' argument on this score is more properly addressed at the pretext stage of the inquiry. *See, e.g.*, *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (explaining that one way a plaintiff can show pretext is by producing "evidence that the proffered bases for the plaintiff's discharge . . . are 'factually false'").

In *Manzer,* this court described three ways that a plaintiff can show pretext:

[O]nce the employer has come forward with a nondiscriminatory reason[,] . . . the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.

To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge. The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are "factually false." The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's

proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for . . . the factfinder to infer illegal discrimination from the plaintiff's prima facie case.

The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup.

*Id.* at 1083-84 (citations, footnote, and internal quotation marks omitted).

Allen and Slone present several arguments attacking as pretextual the Hospital's proffered explanation for discharging them. As noted above, their first claim is that because the Hospital did not have a written policy outlining the procedures to be followed in the release of medical records, and because Davis gave Allen oral permission to retrieve the x-rays, Allen and Slone could not have violated HHC's policy. Their other claim is that Jarvis's testimony "clearly illustrated HHC's plan to eliminate older employees," which shows that age—not the purported privacy violation—actually motivated their discharge. We will address each of these arguments in turn.

### a. *HHC reasonably believed that Allen and Slone had breached patient confidentiality*

Allen and Slone object to the district court's determination that they had violated HIPAA and the Hospital's privacy policy. In particular, the plaintiffs argue that because the Hospital did not have a written policy regarding the procedures to be utilized in the release of medical records, its proffered reason for terminating them must be pretextual. In other words, they claim that the proffered reason "has no basis in fact." *See Wexler*, 317 F.3d at 576 (citation omitted). The Hospital responds that whether Allen and Slone in fact violated HHC's policy is immaterial "as long as HHC possessed an honest belief that these health-care workers breached patient confidentiality and committed a Group I Offense." *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) ("[The employee's] disagreement with the facts uncovered in [the employer's] investigation does not create a genuine issue of material fact that would defeat summary judgment as long as an employer has an honest belief in its proffered nondiscriminatory reason." (internal quotation marks omitted)).

The record demonstrates that Allen and Slone are correct in arguing that the Hospital did not have a written policy governing specific procedures to be followed in releasing medical records. Indeed, neither Warman nor any of the other witnesses who testified in the present case identified or produced such a policy. But Allen's and Slone's claim that there was no policy whatsoever governing the release of medical records is a substantial exaggeration. In particular, they themselves concede that HHC's employee manual clearly identified the release of "unauthorized or confidential information about patients" as a Group I offense, which subjected employees to dismissal upon the first infraction.

The plaintiffs instead continue to argue that because Davis gave oral permission for Allen to retrieve the x-rays, the release of the records cannot be characterized as "unauthorized." That position, however, is substantially undermined by evidence in the record demonstrating that Allen and Slone (1) were informed by another Hospital employee that a written release from Davis was required, and (2) recognized at the time of the incident (or shortly thereafter) that the absence of a

written release was problematic. Indeed, on the evening of the x-ray incident, Slone called Allen and asked her to "[m]ake sure [Davis] signed a release, because if there's not a release signed by [Davis], I could be in trouble over this." Allen then created a written release, signing Davis's name and backdating it so that the release appeared to have been created before the x-rays were taken from the Hospital. This behavior strongly suggests that Allen and Slone recognized that their actions were incompatible with HHC's privacy policy.

We acknowledge that the facts of this case are not a "textbook example" of a privacy violation for which a hospital would usually take such serious action against its long-time employees. The record shows that Allen was not only the biological grandmother of the patient, but also was involved in her care and guardianship (although Allen was admittedly not Emily's legal guardian). Moreover, HHC does not dispute that Davis, as Emily's mother and legal guardian, in fact gave Allen verbal authorization to retrieve the x-rays. The plaintiffs have thus undoubtedly pointed to a weakness in the Hospital's policy, if for no other reason than that this case highlights the potential ambiguity caused by the lack of detail in the employee manual's prohibition against an unauthorized release. But the fact that the Hospital would benefit from developing a more detailed policy on this issue does not mean that Allen and Slone have succeeded in creating a genuine issue of material fact about whether HHC's stated reason for terminating them was a pretext designed to hide age-based discrimination.

We thus agree with the Hospital that, in determining if the plaintiffs have raised a genuine issue of material fact as to pretext, we should consider not whether Allen and Slone *actually* breached patient confidentiality, but rather whether the Hospital had an honestly held belief that they had committed a Group I offense. *See Michael*, 496 F.3d at 598 (explaining that the plaintiff's "disagreement with the facts uncovered in [the employer's] investigation does not create a genuine issue of material fact that would defeat summary judgment as long as an employer has an honest belief in its proffered nondiscriminatory reason" (internal quotation marks omitted)); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect").

This court has explained that

the key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action. An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made. [W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned.

*Michael*, 496 F.3d 598-99 (citations and internal quotation marks omitted).

Applying this standard to the record before us, we conclude that HHC did hold an honest belief that Allen and Slone had violated patient confidentiality. Despite the lack of a written policy detailing precisely what constitutes the "unauthorized release" of medical records, the uncontradicted evidence shows that the Hospital engaged in a thorough investigation to determine whether Allen's and Slone's conduct was inappropriate. This investigation was conducted by personnel in the Human Resources Department at the Hospital and included interviews with Allen and Slone, in addition to a number of employees and supervisors within the radiology department. All of the management officials involved in the investigation agreed that Allen and Slone had committed a Group I offense and recommended that they both be terminated. The response by the plaintiffs failed to produce any evidence indicating that the process the Hospital used to conduct the

investigation was irregular or idiosyncratic. *Cf. Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004) (concluding, in a discriminatory hiring case, that the plaintiff had raised a genuine issue of material fact with respect to pretext in part because the plaintiff produced "evidence of irregularities in the application and selection process").

To the contrary, the record here shows that the Hospital "reasonably relied on the particularized facts that were before it" in deciding to terminate Allen and Slone. *See Michael*, 496 F.3d at 599-600 (citation omitted) (concluding that the employer "presented sound, nondiscriminatory reasons for [disciplining the employee] based on a reasonable investigation of events that occurred"). This is sufficient to belie the plaintiffs' contention that HHC's proffered explanation was a pretext designed to hide age discrimination. *See id.* at 600 (affirming the district court's grant of summary judgment because the employee "was unable to raise a genuine issue of material fact as to whether [the employer's] proffered legitimate explanation was pretextual").

In sum, the plaintiffs have at best succeeded in pointing out ambiguities in the Hospital's formal policy relating to the release of patient records. But they have not shown that the Hospital acted unreasonably or without an honest belief that patient privacy—an issue that is of paramount concern to healthcare providers and specifically protected by HIPAA—had been violated. For these reasons, we reject the plaintiffs' claim that their being subjected to HHC's policy regarding patient privacy was pretextual.

> **b.    *Allen and Slone presented no evidence showing that HHC targeted older employees for discharge***

Allen's and Slone's alternative argument regarding pretext is that the cost-cutting strategies implemented by HHC specifically targeted older employees. According to them, these strategies are sufficient to show that the Hospital was not actually motivated by the privacy violation in terminating the plaintiffs. In other words, they contend that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that [HHC's] explanation is a . . . coverup." *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation marks omitted).

The plaintiffs' argument in this regard is based almost exclusively on statements made by Jarvis in her deposition. But as discussed in Part II.B.2. above, Allen and Slone have mischaracterized Jarvis's testimony. Jarvis stated that HHC (through Warman, its CEO) had attempted to cut costs by increasing employee turnover and targeting employees who had job seniority; i.e., those who had higher salaries and more sick and vacation time. She specifically denied any knowledge of whether those strategies had a disproportionate impact on older employees and, contrary to Allen's and Slone's suggestion, did *not* state that Warman had targeted employees based on their age.

Once Jarvis's testimony is accurately described, it leads to precisely the opposite legal conclusion than the one advocated by the plaintiffs. Indeed, the Supreme Court in *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), has specifically held that the strategies discussed by Jarvis are permissible methods for employers to cut costs:

> When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . . On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, *see* 29 U.S.C. § 631(a), may have worked for a particular employer his entire career,

while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

*Id.* at 611; *see also Allen v. Diebold, Inc.*, 33 F.3d 674, 677 (6th Cir. 1994) (noting that to state a claim for disparate treatment based on age, the "plaintiffs must allege that [the employer] discriminated against them because they were old, not because they were expensive").

Allen's and Slone's claim of pretext, based on an alleged plan to target older employees, is also undercut by the statistical evidence presented by HHC. That evidence showed that, contrary to the plaintiffs' contention, older employees were not disproportionately affected by the Hospital's cost-cutting strategies. In fact, between 1998 and 2004, employees under the age of 40 were actually terminated in a much higher proportion than workers protected by the ADEA. Allen and Slone have thus failed to raise a genuine issue of material fact as to whether the Hospital was motivated by age instead of by its proffered legitimate reason for discharging the plaintiffs. We therefore conclude that the plaintiffs' disparate-treatment claim lacks merit.

## C.　　Disparate impact

### *1. Administrative exhaustion*

Allen and Slone next argue that HHC's cost-cutting measures had a disparate impact on older employees. HHC responds that the plaintiffs' disparate-impact claim should be dismissed because they failed to exhaust administrative remedies made available to them by the EEOC. Specifically, HHC contends that identifying a claim of discrimination before the EEOC with sufficient precision is a jurisdictional prerequisite to maintaining that claim in federal court. HHC further contends that because neither Allen's nor Slone's original EEOC charges "alleges, or even hints at, disparate-impact discrimination," they cannot recover under a theory of disparate-impact liability. We must address HHC's jurisdictional challenge before evaluating the merits of the plaintiffs' disparate-impact claim. *See Cutshall v. Sundquist*, 193 F.3d 466, 471 (6th Cir. 1999) ("Before we reach the merits of the parties' arguments, we must address the . . . contention that the district court lacked subject-matter jurisdiction.")

HHC correctly points out that the plaintiffs "must file a charge with the EEOC before filing a complaint alleging age discrimination in federal court." *See Davis v. Sodexho*, *Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). The Hospital is also correct to note that an EEOC charge must contain "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *See* 29 C.F.R. § 1601.12(b). But HHC's assertion that the exhaustion requirement is a jurisdictional prerequisite is no longer accurate in light of the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006); *see also Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 341 (6th Cir. 2006) (noting that *Arbaugh* "may require reconsideration of our precedent that administrative exhaustion is a jurisdictional matter rather than an element of" a discrimination claim, but declining to address the question because the plaintiff was able to show that he had administratively exhausted the claims at issue).

In *Arbaugh*, the Supreme Court held that Title VII's definition of an "employer," which limits the application of Title VII to employers who have at least 15 employees, "is an element of a plaintiff's claim for relief, not a jurisdictional issue." 546 U.S. at 509, 515-16. To reach this conclusion, the Court adopted the following rule of construction to determine whether a statutory requirement is jurisdictional in nature:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not

be left to wrestle with the issue. . . . But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-jurisdictional in character.

*Id*. at 515-16 (citation omitted). This clear-statement rule requires us to reconsider this court's previous holding that "federal courts do not have subject matter jurisdiction to hear [ADEA] claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002) (citation omitted). We now hold, in light of *Arbaugh*, that although administrative exhaustion is still a statutory prerequisite to maintaining claims brought under the ADEA, the prerequisite does not state a limitation on federal courts' subject matter jurisdiction over such claims. To reach this conclusion, we look to the statute that sets forth the requirement at issue. *See Arbaugh*, 546 U.S. at 515-16 (indicating that the clear-statement rule involves looking to the "*statutory* limitation" to determine whether such limitation is jurisdictional (emphasis added)).

HHC cites the provision 29 U.S.C. § 623(d) for the proposition that "filing an age discrimination charge with the EEOC is a jurisdictional prerequisite to the filing of a civil action." But that subsection does not address prerequisites at all. *See id.* (making it unlawful for employers to discriminate against employees for participating in a proceeding litigated under the ADEA). We assume that HHC intended to cite 29 U.S.C. § 626(d) instead because this provision sets forth administrative filing requirements that are relevant to this case. *See Vinson v. Ford Motor Co.*, 806 F.2d 686, 688 (6th Cir. 1986) (citing 29 U.S.C. § 626(d) for the proposition that "[i]t is well settled that the filing of a charge with the EEOC is a jurisdictional prerequisite to the filing of a civil action under ADEA.") Section 626(d) provides that

> [n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]. Such a charge shall be filed—
>
> (1) within 180 days after the alleged unlawful practice occurred; or
>
> (2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.
>
> Upon receiving such a charge, the Commission shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.

Two principal considerations lead us to conclude that this subsection does not describe a limitation on federal subject matter jurisdiction. First, nothing in this subsection "clearly states that a threshold limitation on a statute's scope shall count as jurisdictional" because it "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *See Arbaugh*, 546 U.S. at 515 (citation and internal quotation marks omitted). The term "jurisdiction," for example, never appears in this provision's text or title. We recognize that § 626(d) states that "no civil action may be commenced" until an EEOC charge has been filed. *Id.* But this language alone does not suffice to show that Congress intended for the requirement to be jurisdictional in nature. *See Arbaugh*, 546 U.S. at 510 (noting that "in recent decisions, we have clarified that time prescriptions, however emphatic, are not properly typed jurisdictional" (citations and internal quotation marks omitted)).

The second consideration is that the ADEA contains another, separate provision that speaks directly to jurisdiction. In particular, 29 U.S.C. § 626(c) is titled "Civil actions; persons aggrieved;

*jurisdiction*; judicial relief; termination of individual action upon commencement of action by Commission; jury trial" (emphasis added).  Section 626(c)(1) provides that

> [a]ny person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter: Provided, [t]hat the right of any person to bring such action shall terminate upon the commencement of an action by the [EEOC] to enforce the right of such employee under this chapter.

Unlike § 626(d), the above-referenced subsection "speak[s] in jurisdictional terms" and "refer[s] . . . to the jurisdiction of the district courts."  *See Arbaugh*, 546 U.S. at 515-16 (citation and internal quotation marks omitted).  Section 626(c)(1) establishes that any court of competent jurisdiction may hear a civil action brought under the ADEA.  Indeed, where Congress intended to limit that jurisdiction, it did so expressly and in the very same provision, declaring that the right to bring a civil action "shall terminate" if and when the EEOC commences an action under the ADEA.

Congress did not, by contrast, clearly state in § 626(c)(1) that filing a charge with the EEOC is a precondition to the federal courts' jurisdiction over ADEA claims.  We therefore hold that the administrative-exhaustion requirement set forth in 29 U.S.C. § 626(d) is not jurisdictional in nature, but is instead best understood as a prudential prerequisite to filing a claim in federal court.  *See Wilson v. MVM, Inc.*, 475 F.3d 166, 174-75 (3d Cir. 2007) (distinguishing between prudential and jurisdictional exhaustion requirements, and holding that the administrative-exhaustion requirement found in the Rehabilitation Act is prudential in nature).

Turning now to the case before us, we note that HHC has raised a legitimate question as to whether Allen's and Slone's disparate-impact claims have been exhausted.  Specifically, HHC plausibly contends that the plaintiffs did not adequately describe their discrimination claim such that an EEOC investigation into potential liability based on disparate impact could have "reasonably expected to grow out of the charge of discrimination."  *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991) (citation omitted) (holding that this court does not necessarily require the claim to be specifically raised in an EEOC charge provided that it satisfies this scope-of-investigation test).  Allen simply stated in her EEOC charge that she "was discharged because of [her] age."  Slone included a slightly more detailed explanation:  "I was informed that I was terminated for violation of the Health Information Privacy Act.  I believe that I was discharged because of my age, 53, in violation of the Age Discrimination in Employment Act (ADEA)."

We find this question to be a close one.  Because administrative exhaustion does not raise a jurisdictional question under the ADEA, however, we may decline to decide the issue if reaching the merits of Allen's and Slone's disparate-impact claim provides a clearer basis for the disposition of the case.  *See State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 868 F.2d 810, 813 (6th Cir. 1989) (holding that because the merits of the plaintiff's underlying claims were sufficiently clear, this court did not need to interpret the scope of a Supreme Court case discussing the reviewability of agency decisions).  As discussed below, we conclude that the district court correctly granted summary judgment for HHC on the issue of disparate impact.

### 2. Merits

"Claims that stress disparate impact involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 239 (2005) (citation, brackets and internal quotation marks omitted).  In *City of Jackson*, the Supreme Court stated unequivocally that recovery is available under the ADEA to plaintiffs who raise discrimination claims based on a theory of disparate impact. *Id.* at 240.  That decision also cautions that "the scope of disparate-impact liability under [the] ADEA is narrower than under Title VII." *Id.*  The Court reasoned that "age, unlike race

or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment." *Id.* Moreover, the Court referred to amendments to Title VII contained in the Civil Rights Act of 1991, 105 Stat. 1071, which expanded the availability of disparate-impact liability in the Title VII context, and effectively overruled the Supreme Court's narrow construction of Title VII as set forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989) (holding that "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack."). Because those amendments did not change the ADEA or address age discrimination, the Supreme Court reasoned that "*Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA." *City of Jackson*, 544 U.S. at 240.

Applying the *Wards Cove* interpretation of disparate-impact liability to the ADEA is significant. Plaintiffs that allege discrimination based on a theory of disparate impact under the ADEA must "isolate and identify the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Meacham et al. v. Knolls Atomic Power Lab.*, 128 S. Ct. 2395, 2405-06 (2008) (emphasis in the original) (brackets, citation, and internal quotation marks omitted). This specific-practice requirement is important because isolating and identifying such practices "is not a trivial burden," and involves more than simply "point[ing] to a generalized policy that leads to such an impact." *See id.* (quoting *City of Jackson*, 544 U.S. at 241) (brackets and internal quotation marks omitted). In *City of Jackson*, for example, the Supreme Court held that the petitioners had not raised a genuine issue of material fact because

> [the] petitioners have done little more than point out that the pay plan at issue is relatively less generous to older workers than to younger workers. They have not identified any specific test, requirement, or practice . . . that has an adverse impact on older workers. As we held in *Wards Cove*, it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities. Petitioners have failed to do so. Their failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances.

*City of Jackson*, 544 U.S. at 241 (emphasis in the original) (citations and internal quotation marks omitted).

After the Supreme Court confirmed the availability of disparate-impact claims under the ADEA in *City of Jackson*, questions remained about the nature of a provision of the ADEA that exempts employers from liability if they can show that their employment practices are based on "reasonable factors other than age" (RFOA). 29 U.S.C. §623(f)(1). The provision in question states that

> [i]t shall not be unlawful for an employer, employment agency, or labor organization . . . to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section [prohibiting certain discriminatory employment and labor practices related to age] where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on *reasonable factors other than age*.

29 U.S.C. § 623(f)(1) (emphasis added). Some courts, including the district court below, have incorrectly concluded that RFOA is an element of a disparate impact claim, which effectively requires plaintiffs to show that a particular employment practice is unreasonable. To the contrary,

*Meacham* clarified that the RFOA exemption is an affirmative defense that places the burden of persuasion on employers to show that a practice that has a disparate impact on employees who are at least 40 years old is based on reasonable factors other than age. *See Meacham*, 128 S. Ct. at 2400-02 (citing 29 U.S.C. § 623(f)(1)). That is, once a plaintiff has satisfied the nontrivial burden of identifying a specific employment practice, the burden of persuasion shifts to the employer to show that the practice is supported by a RFOA. *Id.* The Supreme Court has acknowledged that this interpretation of the RFOA exemption effectively "makes it harder and costlier to defend [against disparate-impact claims] than if employers merely bore the burden of production." *See id.* at 2406.

Bearing these clarifications in mind, Allen and Slone argue on appeal that "the effect of the policy demanding terminations of the highest paid employees has an age discrimination effect that is improper." The plaintiffs, however, have failed to satisfy their burden of isolating and identifying a specific employment practice that disproportionately impacts employees who are at least 40 years old. As we have already explained, the plaintiffs have at best alleged that HHC desired to reduce costs associated with its highly paid workforce, including those costs associated with employees with greater seniority. But the plaintiffs have not established that this corporate desire evolved into an identifiable practice that disproportionately harms workers who are at least 40 years old. Because Allen and Slone have simply "point[ed] to a generalized policy," as opposed to specific practice, they have therefore failed to raise a genuine question of material fact with respect to their disparate-impact claim. *See Meacham*, 128 S.Ct. at 2405-06.

The plaintiffs have also failed to proffer statistics showing that older workers have been disproportionately harmed. As the district court observed, between July 1998 and December 2004, the percentage of total workers in the protected class actually increased from 40.6% to 50.4%. Furthermore, as we have already noted, between 1998 and 2004, HHC showed that employees *under* the age of 40 were terminated in a significantly higher proportion than workers protected by the ADEA.

Nor is the plaintiffs' disparate-impact claim salvaged by the allegation that the number of terminations of those over 40 years of age increased from 14.3% to 62.5% of all terminations between 2002 and 2003. As the district court noted, this data is not statistically significant because the pools from which those percentages were drawn were very small—i.e., there were only 21 terminations in 2002 and 16 terminations in 2003. The court also noted that an abnormally large number of the employees terminated in 2002 were under the age of 40. Comparing this aberrational data side-by-side with statistics from 2003 thus presents a distorted image of HHC's termination practices between those two years. This distortion is compounded because there were a quarter fewer total terminations in 2003 than in 2002. Because there were already relatively few total terminations for these interim two years, the small numerical differences translate into large percentage swings that are, as the district court determined, not statistically significant. The plaintiffs have not pointed to any evidence in the record that would cause us to question the court's analysis on this point. We therefore conclude that there is no material evidence in the record supporting Allen's and Slone's disparate-impact claim.

Finally, we note that the district court erred in interpreting the ADEA's RFOA exemption as an element of the plaintiffs' claim rather than as an affirmative defense that shifts the burden of persuasion to HHC. *See Meacham*, 128 S.Ct. at 2400-02. In particular, the district court stated that Allen and Slone must show that the practice in question "is based on unreasonable factors." But the error was harmless because Allen's and Slone's claim fails for the two independent reasons already discussed—i.e., by failing to satisfy the specific-practice requirement and by not providing sufficient statistical evidence of discriminatory impact. The court ultimately held that "[l]owering overall employee costs by increasing turnover and discouraging employees from using vacation and sick time might not be the wisest method of running a hospital, but it is a reasonable factor other than age in response to HHC's bulging employee costs." We agree.

**D.      The statistical evidence relied upon by the district court**

Perhaps realizing that the statistical data relied upon by the district court harmed their disparate-treatment and disparate-impact claims, Allen and Slone now argue on appeal that the statistical evidence relied upon by the district court "should have been prohibited." They contend that (1) the Hospital failed to disclose certain statistical evidence about its employees during discovery, (2) the magistrate judge erred in failing to compel disclosure of such evidence, (3) the Hospital improperly used this evidence to support its motion for summary judgment; namely, as part of its expert's report, and (4) the district court improperly relied on this evidence in dismissing the plaintiffs' claims. They frame all of these arguments as a general objection to the district court's grant of summary judgment to HHC. Indeed, besides a vague reference to the "manifest injustice" that allegedly occurred, the plaintiffs do not explain the precise legal theory on which these claims are based or state what standard of review we should apply.

The Hospital, in contrast, contends that the plaintiffs' arguments are really discovery-related objections that should be reviewed under the abuse-of-discretion standard. It also claims that, to the extent that Allen's and Slone's arguments are based on the scope of discovery as determined by the district court, they have waived such claims by failing to make such an argument in their opening brief. A review of the record demonstrates that, regardless of how Allen's and Slone's arguments are construed, their claims on this issue are meritless. The basic flaw in the plaintiffs' position is that they were provided with all of the evidence relied upon by the district court in its decision.

Allen and Slone first contend that they were prejudiced by the Hospital's refusal to disclose—and the magistrate judge's failure to compel disclosure of—"identifying information, including age, salary, position and reason for termination of all Hospital employees over a three year period including the termination dates of both Appellants." The Hospital did indeed refuse to disclose this data, arguing in its response to the plaintiffs' interrogatories that the information requested was irrelevant and that the request was overly broad.

At a hearing held on the plaintiffs' subsequent motion to compel such evidence, the magistrate judge agreed that the discovery request was overbroad. The magistrate judge did, however, require the Hospital to provide information about employees over the age of 40 who had been terminated for Group 1 violations. These were the employees who, the judge reasoned, were similarly situated to Allen and Slone.

The plaintiffs never filed an objection to the magistrate judge's rulings with the district court, and they have not explicitly challenged those rulings on appeal. HHC thus correctly points out that any such claim has been waived. *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). Moreover, despite Allen's and Slone's assertions to the contrary, none of the information allegedly not provided to them was used by either the Hospital in its expert's report or relied upon by the district court in granting summary judgment to HHC.

Allen and Slone next complain that the district court "made its ruling based on HHC's statistical evidence and expert report. That statistical evidence was not provided to Appellants." A review of the district court's opinion and the report prepared by HHC's expert make clear that the first part of Allen's and Slone's allegation is correct—the district court did rely upon statistical data provided by the Hospital to support the conclusion that the plaintiffs had failed to establish either discriminatory intent or discriminatory impact based on age. The data shows how HHC's workforce had changed based on age as of three dates in 1998, 2002, and 2004. But as the Hospital correctly notes, most of that information *was* provided to the plaintiffs in response to their interrogatories. The plaintiffs' expert, however, failed to include or analyze this data in his report.

Indeed, the only subset of data not given to the plaintiffs as part of their discovery request was the 2002 data, which Allen and Slone never requested from HHC. The plaintiffs received this 2002 data when it was presented in the report of HHC's expert, but chose not to supplement their own expert's report based on the new information. The plaintiffs' argument that they were prejudiced by the district court's use of evidence to which they allegedly did not have access therefore fails because they were in fact provided with all of the data relied upon by the court.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.