NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0878n.06

No. 10-5783

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Dec 21, 2011*

LEONARD GREEN, Clerk

IDELLA RUTHERFORD,                          )
                                            )
    Plaintiff-Appellant,                )          ON APPEAL FROM THE
                                            )          UNITED STATES DISTRICT
        v.                              )          COURT FOR THE EASTERN
                                            )          DISTRICT OF KENTUCKY
BRITTHAVEN, INC.,                           )
                                            )
    Defendant-Appellee.                 )
                                            )

BEFORE: MARTIN, GUY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff-appellant Idella Rutherford filed this action alleging age discrimination against her former employer, defendant-appellee Britthaven, Inc. ("Britthaven"). Rutherford appeals the district court's grant of summary judgment in favor of Britthaven. We affirm.

I.

In its June 2010 opinion, the district court summarized the relevant background facts as follows:

> Britthaven, Inc. hired the plaintiff, Idella Rutherford, to work as a licensed practical nurse ("LPN") at its nursing home in Bell County, Kentucky in May of 1981. As part of her responsibilities as an LPN, Rutherford supervised the nursing home's certified nurses aides ("CNAs") and other subordinate staff. In turn, the plaintiff reported to the director of nursing, Vivian Lambert, and Britthaven's administrator, Kelly Goodin.

* * *

In November of 2006, Britthaven apparently revised its policy on resident abuse and neglect. The policy required employees who witness or suspect the abuse or neglect of residents, or misappropriation of their property, to immediately report the alleged incident to their supervisor. In turn, supervisors who received reports of such mistreatment were obligated to immediately inform the nursing home's administrator, who would investigate the allegations. On November 17, Rutherford acknowledged being informed of the policy. According to the notification she signed, "[a]ny employee who fails to immediately report suspected abuse or neglect of a resident will face disciplinary action up to and including termination of employment." Neither the policy nor the notification she signed defined the terms "abuse" or "neglect."

\* \* \*

[T]wo occurrences on January 16, 2008, while Rutherford was on duty as the charge nurse, . . . ultimately led to her termination. Both incidents involved allegations of misconduct by Ashley, a 19 year-old CNA under Rutherford's supervision, and were observed by Becky Taylor, another aide under Rutherford's supervision.

The first incident occurred at approximately 8:30 in the morning while Ashley was collecting breakfast trays from the residents' rooms. Taylor overheard a resident ask Ashley to feed her. According to Taylor, Ashley responded in a "hateful" tone that she could not feed the resident until she finished collecting the trays. When the resident persisted in her request to be fed while her food was hot, Ashley suggested that she visit the dining room for her meal. The episode concluded when the resident said that [she would] feed herself and then report Ashley to Goodin.

At approximately 10:45 that morning, Taylor and Melinda Bracey, a nurse's aide, witnessed the second incident, which involved Ashley and another resident. This time, when the resident asked for some ice water, Ashley responded that she brought some earlier in the morning. According to Taylor, when the resident disputed this statement, Ashley screamed at the resident not to call her a liar, accused him of lying, and threatened not to bring him ice water the next day.

Taylor did not report these incidents immediately to Rutherford. Instead, she debated whether Ashley's behavior was abusive such that she was required to report it to her superiors. At approximately 1 p.m., she concluded that she needed to apprise the plaintiff of Ashley's conduct. Connie Hatfield, an LPN being trained by Rutherford, was also present for Taylor's report. There are conflicting accounts in the record as to precisely what Taylor told Rutherford.

According to the plaintiff, Taylor told her that Ashley had a "bad attitude" with residents. When asked to explain what she meant, Taylor said she heard Ashley tell a resident that she could not feed her until she collected all the breakfast trays. The plaintiff pressed Taylor for more details[,] but was told no more than Ashley displayed attitude with residents, and the morning's episode was not the first such occasion. Rutherford denied being informed about the ice water incident.

Other witnesses indicated that Taylor told Rutherford more than Ashley merely had a bad attitude. Taylor, for instance, stated that she reported both January 16 incidents to Rutherford. Moreover, she claims to have informed the plaintiff that Ashley screamed at a resident and [spoke] to him "like a dog." Hatfield, the LPN shadowing Rutherford, recalled hearing Taylor report mean, hateful or rude treatment by Ashley towards a resident.

Despite Taylor's report, Rutherford decided against relaying it to the director of nursing or the administrator. Instead, she decided to monitor Ashley's behavior to see if she could observe any inappropriate behavior first-hand. As it turns out, later that same day, Ashley approached the plaintiff to advise her of the first incident with the resident. According to Rutherford, Ashley confirmed that she had told the resident that she could not feed her until she collected the breakfast trays. Ashley, however, stated that she eventually offered to feed the resident, but the resident refused her assistance and threatened to report Ashley to the administrator. As a result of her discussion with Ashley, Rutherford believed that the matter had been adequately addressed and again chose not to inform the facility's administrator.

The next day, January 17, Taylor approached Regina Miracle, the QI director, and advised her of the previous day's incidents. In turn, Miracle relayed the report to other nursing home staff, including Goodin, and they opened an investigation into the "allegations of verbal abuse" by Ashley. During the course of the investigation, Miracle interviewed and took statements from Taylor, Ashley, Bracey, the plaintiff, and Hatfield. Based on the information obtained during the investigation, the administration concluded that Ashley's conduct was not abusive but "definitely inappropriate." Consequently, on January 18, 2008, Ashley was fired for "speaking to residents in an inappropriate fashion." Rutherford's employment was terminated on the same day for "not reporting possible abuse and not beginning an investigation into the report." She was 55 years old at the time. Of the other employees involved, only Taylor was disciplined, receiving a written reprimand for failing "to report alleged abuse in a timely manner." According to the investigation notes, she was not fired because she followed up on her initial report with Britthaven's management.

*Rutherford v. Britthaven, Inc.*, Civil No. 09-51-GFVT, 2010 WL 2228359, at \*1-3 (E.D. Ky. June 2, 2010) (internal citations and footnotes omitted).

On January 16, 2009, Rutherford filed a complaint against Britthaven alleging age discrimination in violation of the Kentucky Civil Rights Act. Ky. Rev. Stat. Ann. § 344.040. The action was thereafter removed to the United States District Court for the Eastern District of Kentucky on the basis of diversity jurisdiction. Following discovery, Britthaven moved for summary judgment. The district court held that Rutherford failed to demonstrate a genuine issue of material fact regarding pretext and granted Britthaven's motion. This timely appeal followed.

II.

We review de novo a district court's grant of summary judgment. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether the movant has met this burden, we view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

Age discrimination claims brought under the Kentucky Civil Rights Act are analyzed under the same standard as claims brought under the Age Discrimination in Employment Act ("ADEA"). *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008); *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005). ADEA claims are in turn analyzed under the same

framework as that employed under Title VII. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

Rutherford concedes that she has no direct evidence of age discrimination. Accordingly, we apply the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Under this standard, Rutherford must first establish a prima facie case of age discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside of the protected class. *Grosjean*, 349 F.3d at 335. "In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." *Id.*

If Rutherford establishes a prima facie case of age discrimination, the burden shifts to Britthaven to articulate a legitimate, nondiscriminatory reason for the termination. *Id.* If Britthaven meets this burden, Rutherford must then "produce sufficient evidence from which the jury may reasonably reject [Britthaven's] explanation." *Id.* (internal quotation marks and citation omitted). At all times, Rutherford retains the burden of persuasion as to the ultimate issue of age discrimination. *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) (citing *Burdine*, 450 U.S. at 252-53).

In the case at bar, Britthaven does not dispute that Rutherford has established a prima facie case of discrimination. Indeed, Rutherford was 55 years old when she was terminated, was qualified for her position as charge nurse, and was replaced by a substantially younger woman. In turn, Rutherford does not dispute that Britthaven has met its burden in articulating a nondiscriminatory reason for her termination: the failure to relay a report of possible abuse. Thus, to survive summary judgment, Rutherford must put forth evidence indicating that Britthaven's nondiscriminatory reasoning is pretextual. *Burdine*, 450 U.S. at 256. This she has failed to do.

To demonstrate that an employer's nondiscriminatory reasoning is pretextual, a plaintiff must show: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation marks, citation, and emphasis omitted) (overruled on other grounds). In this case, Rutherford asserts that Britthaven's proffered reason was pretextual because it was insufficient to motivate her termination and, in the alternative, because the reason had no basis in fact. We address each argument in turn.

A plaintiff may establish pretext by showing that the proffered nondiscriminatory reasons were insufficient to motivate the discharge. Such insufficiency is often established through evidence demonstrating "that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*. To be similarly situated,

> "the individuals with whom the plaintiff seeks to compare [her] treatment must have
> dealt with the same supervisor, have been subject to the same standards and have

> engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Exact equivalence, however, it not required. Rather, "the plaintiff and the employee with whom the plaintiff seeks to compare . . . herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich*, 154 F.3d at 352 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

Rutherford asserts that she is similarly situated to three Britthaven employees: Becky Taylor, Connie Hatfield, and Melinda Bracey. All of these employees are substantially younger than Rutherford and were not terminated for their connection to the incidents of alleged abuse by Ashley. The district court held that none of these employees are similarly situated to Rutherford. We agree.

First and foremost, the conduct of Taylor, Hatfield, and Bracey was materially different from that of Rutherford. *Smith*, 220 F.3d at 762. Taylor, a CNA under Rutherford's supervision, actually reported the incidents of possible abuse to both Rutherford and Miracle. Hatfield, a charge nurse in training, did not receive a report of possible abuse, but was merely present when the report was made to Rutherford. Finally, Bracey, a CNA working alongside Ashley when one of the alleged incidents occurred, did not receive a report of possible abuse, but observed the behavior of Ashley and failed to recognize potential abuse.[1]

---

[1]In addition, Bracey is not similarly situated to Rutherford because Bracey was a new hire with little experience. *See Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 326 (6th Cir. 2001) (noting that two employees were not similarly situated in part because of "different levels of experience").

Unlike Taylor, Hatfield, and Bracey, Rutherford was expressly required to receive reports of possible abuse and relay those reports to the Administrator without delay.[2]  Once a report was received, Rutherford had no discretion to decide whether the incident was reportable or constituted actual abuse.  Nevertheless, Rutherford intentionally chose not to communicate the report of alleged abuse.  This fact distinguishes her conduct from that of Taylor, Hatfield, and Bracey.

Moreover, none of the employees identified by Rutherford had supervisory responsibilities.  Indeed, all three of these employees were under *Rutherford's* supervision.  We have previously held supervisory and non-supervisory employees to not be similarly situated.[3]  *See Quinn-Hunt v. Bennett Enters., Inc.*, 211 F. App'x 452, 459 (6th Cir. 2006) ("Stickley is a supervisory employee, and Quinn-Hunt is not. . . . This weighs against a finding that they are similarly situated."); *Pierce*, 40 F.3d at 802 (holding that a supervisor was not similarly situated to a non-supervisor).  Moreover, employees with different job responsibilities may not be similarly situated.[4]  *Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386, 391 (6th Cir. 2008) (finding employees not to be similarly

---

[2]Indeed, when asked why Taylor, Hatfield, and Bracey were not terminated for their connection to the January 2008 incidents, Goodin testified that they had not *received a report* of possible abuse and failed to relay that report to the Administrator.

[3]Rutherford asserts, without citation to the record, that her title as supervisor was "meaningless."  However, the undisputed testimony of Goodin establishes that the supervisory authority of the charge nurse was significant.  Indeed, the charge nurse was responsible for the supervision of all the CNAs in her wing.

[4]The responsibilities of a charge nurse are different from those of a CNA.  A CNA provides personal care to residents, while a charge nurse provides medical care, interacts with doctors, responds to emergencies, and provides supervision.

situated in part because they had different job duties); *Campbell*, 23 F. App'x at 325 ("Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.") (citations omitted). Accordingly, because Taylor, Hatfield, and Bracey are not similarly situated to Rutherford, the fact that they were not terminated does not demonstrate pretext.[5]

In the alternative, Rutherford attempts to show pretext by arguing that Britthaven's proffered nondiscriminatory reason has no basis in fact. A reason has "no basis in fact" when it is "factually false." *Manzer*, 29 F.3d at 1084. To this end, we do not consider whether the alleged nondiscriminatory reason supporting the termination actually occurred, but whether the employer "had an honestly held belief" that the lawful reason supporting the termination decision occurred. *Allen*, 545 F.3d at 398. "An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (internal quotation marks and citation omitted).

Rutherford asserts that Britthaven did not have a good-faith belief in the proffered reason for her termination because it was ultimately determined that Ashley's behavior did not constitute abuse. Rutherford, however, acknowledged that having a "bad attitude" toward a patient "[c]ould be"

---

[5]The district court also held that Rutherford was not similarly situated to Taylor, Hatfield, and Bracey because these employees did not have a similar disciplinary history. Goodin, however, testified that Rutherford's history of disciplinary problems did not factor into the termination decision.

considered abuse. Such an attitude is precisely the behavior that was reported to Rutherford. And, pursuant to Britthaven's policy, Rutherford was to relay all reports of *possible* abuse. Thus, it is undisputed that Rutherford violated Britthaven's policy. That Ashley's behavior was not ultimately determined to constitute abuse does not change the fact that Rutherford violated the policy, and Britthaven's business judgment regarding the appropriate response to this violation is not subject to judicial second-guessing. *Smith*, 220 F.3d at 763 ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management.").[6]

In sum, because no similarly-situated employee was treated more favorably than Rutherford, and because there is no evidence that Britthaven did not have a good-faith belief in its nondiscriminatory reason for the termination, Rutherford has failed to create a genuine issue of fact regarding pretext. Accordingly, her case was properly dismissed.

III.

For these reasons, we affirm the judgment of the district court.

---

[6]In addition, it is undisputed that Britthaven conducted a full investigation into the conduct that resulted in Rutherford's termination. This investigation supports a finding that Britthaven had a good-faith belief in its nondiscriminatory reason for the termination. *See Allen*, 545 F.3d at 398 (holding that the employer had a good-faith belief in its nondiscriminatory reasoning when "the uncontradicted evidence [demonstrated] that the [employer] engaged in a thorough investigation").