NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0159n.06

Case No. 14-3215

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 02, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ERIC D. WHITE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| DUKE ENERGY-KENTUCKY, INC., | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, CLAY, and GRIFFIN, Circuit Judges.

**SILER**, Circuit Judge. Plaintiff Eric D. White appeals the district court's grant of summary judgment in favor of Defendant Duke Energy-Kentucky, Inc. ("Duke Energy"). For the reasons stated below, we **REVERSE** the district court's grant of Duke Energy's motion for summary judgment and **REMAND** for further proceedings.

## BACKGROUND

### I. Factual Background

From 1990 to 2011, White was employed by Duke Energy or its predecessors at the corporation's East Bend Station in Kentucky. (R.19-1 Pg. ID #240, ¶ 2). For most of his time with the company, White was a unionized employee with the formal job designation of Instrumentation Technician. (*Id*. at ¶¶ 2-3). In 2009, White was promoted to the non-union

position of Work Management Planner. (*Id.* at Pg. ID #242 ¶ 11). At that time, White was the only African-American at the East Bend Station to hold such a position. (*Id*. at Pg. ID. #40 ¶ 2). No one directly reported to White in his capacity as Work Management Planner. (Appellee's Br. at 2).

On the afternoon of November 23, 2011, the day before Thanksgiving, White observed two Caucasian employees at the East Bend Station, Duane Doyle and Daryl Duty, while they were engaged in a verbal altercation. (R. 32 Pg. ID #630; *see also* R. 19 Pg. ID #236 (alluding to the race of the employees)). White told Doyle and Duty to "break it up," at which point the two men separated, and White prepared to leave work for the day. (White Deposition, R. 17 Pg. ID #127-28). On his way to clock out, White was stopped by Duty, who asked White to ensure that Doyle did not tamper with Duty's car. White then followed Doyle as both men clocked out of work. (*Id*. at Pg. ID #128). White did not observe Doyle make any moves toward Duty's car, but he did ask Doyle for an explanation of the earlier incident. (*Id*. at Pg. ID #128-29). Doyle explained that he had been looking through a storage area for a copper fitting when Duty had challenged him. The two began to argue and eventually Doyle had pushed him to the ground. (White Affidavit, R.19-1 Pg. ID #242-43). At some point, the argument moved to the maintenance area, where the two men were observed by White. (*Id*.) Doyle suggested that he may have been injured during the confrontation. (White Deposition, R. 17 Pg. ID #129).

Immediately after this exchange, White went back inside the facility and heard Duty's version of events. (*Id*.) Duty claimed that, after an initial exchange of words, Doyle had kicked a garbage can at him and that the two men had wrestled with each other. Duty also claimed that his pants had been torn during the altercation. (*Id*. at Pg. ID #93). White was able to see that Duty's pants were torn; White also saw what he interpreted to be a scratch on Duty's leg. (*Id*. at

Pg. ID #93-94). White then left the facility and did not return until five days later, on November 29, 2011. (R. 32 Pg. ID #631).

When he returned to work after the Thanksgiving holiday, White learned that other people at the facility were talking about a fight between Doyle and Duty. White also heard that the fight had been reported and was being investigated. (White Deposition, R. 17 Pg. ID #130-31). On his first day back, White was approached by Doyle, who asked White to serve as an intermediary between him and Duty in an effort to put their previous problems behind them and keep the incident quiet. (White Deposition, R. 17 Pg. ID #134-35; White Affidavit, R. 19-1 Pg. ID #423, ¶ 20). Doyle also revealed that he was experiencing pain in his side. (White Deposition, R. 17 Pg. ID #135). Either shortly before or shortly after this conversation, Doyle also made a direct overture to Duty with a handwritten note in which he stated his intention to deny the seriousness of the incident. (Note, App. #70).

White consented to Doyle's request and relayed Doyle's desire for a détente to Duty. None of the three men made any effort to report the fight or to report any injuries sustained during the altercation. (White Deposition, R. 17 Pg. ID #135-36). Both Doyle and Duty had reason to fear any disciplinary action. Doyle had a Last-Chance Letter in his file for previously falsifying company documents. (Human Resources Investigation, App. #7). Duty also had a Last-Chance Letter as a result of an earlier fight with a coworker. (*Id.*)

On December 6, 2011, Teresa Taylor, the Human Resources manager for East Bend Station, was informed of the Doyle-Duty altercation by Bill Hyland, the Maintenance Supervisor at the facility. (Documentation [of] Maintenance Issue, App. #5-6). Hyland had learned about the fight from employee Mark House. (Doyle Deposition, R. 21 Pg. ID #371, 373-74). Taylor convened a committee to investigate the incident and called White to testify on the morning of

December 8.  The investigation committee consisted of Taylor, Hyland, and George Dilz, White's direct supervisor.

During his initial meeting with the investigation committee, White was asked, "Did you see or do you have any information pertaining to the physical confrontation between Daryl Duty and Duane Doyle on Wednesday, November 23, 2011?"  (Fact Finding Meeting Notes #1, App. #1).  White's response was as follows:

> I was going to the refrigerator to get food and heard yelling. Walked out and saw Daryl and Duane about 4 feet apart yelling at each other. I heard f-bombs and I heard Duane tell Daryl that he would kick his fat ass and Daryl said come on. I said break it up. Duane grabbed his lunch box and walked away. Daryl Duty left also into the ICE break room. Mark House headed into the maintenance break room.

(*Id.*).  White was also asked, "…what action did you take concerning this event, if any?"  White responded, "I said break it up!"  (*Id.*).  White was subsequently asked, "Is there any information that you know about that is important to this matter?"  White's response was a simple "no."  (*Id.*)

Later that day, White informed Hyland that White did in fact have additional information about the incident.  During his second meeting with the investigative committee, White related both versions of events that he had received from Doyle and Duty, including their claims of injuries resulting from the encounter.  (Fact Finding Meeting Notes #2, App. #2).  White also acknowledged his role as an intermediary between the two men after the holiday break.  (*Id.*)

The investigatory committee concluded that White had previous knowledge about the altercation between Doyle and Duty yet failed to report the incident to management.  Accordingly, Taylor expanded the investigation to include White's actions.  In her investigative report, Taylor determined that White had violated the General Workplace Security Policy, Harassment Policy, and Code of Business Ethics by failing to report the act of workplace

violence, failing to report injuries sustained in connection with that incident, and withholding information during his first fact-finding meeting. (Investigative Report, App. #9) Taylor also stated that "two incidents of insubordination and one incident of falsification of company documents substantiated the need for termination." (*Id.*) Taylor has not been able to substantiate the basis for the claims of insubordination and no documents have been found to corroborate those claims. (R.19 Pg. ID #231). While White was accused of falsifying company documents in 2005, he was able to rebut those accusations and was instead given a brief suspension for violating company policies on flextime. (*Id.* at Pg. ID #225; App. #17-18). Nonetheless, Taylor's report of December 15, 2011, recommended White's termination. (Investigative Report, App. #9-10). White was fired the next day. (Non-Union Corrective Action Notice, App. #35). The stated reasons for his termination were the violations of company policies mentioned in Taylor's investigative report. (*Id.*) Duty was also fired for being the aggressor in the altercation. (Human Resources Investigation, App. #76). White was replaced by Greg Bouras, a Caucasian. (R. 31 Pg. ID #633).

White challenged his termination internally through Duke Energy's Recourse Policy, but was ultimately denied. The Recourse Investigation Report recommended that White's termination be upheld, but also "recommended that management re-examine the decision regarding Duane Doyle and that he, too, may not have fully lived up to management expectations as it relates to reporting an injury." (*Id.* at App. #79).

## II. Procedural Background

White filed a charge with the Equal Employment Opportunity Commissions alleging race discrimination and obtained a right to sue letter. (R. 32 Pg. ID #633). White later filed a complaint in the Southern District of Ohio alleging that Duke Energy's termination of his

employment was based on racial discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act. (*Id.*)

The district court granted summary judgment to Duke Energy. While it found that White had established a *prima facie* case for racial discrimination under state and federal law (*Id.* at Pg. ID #639), it held that White had not created a genuine issue of material fact as to whether the proffered legitimate reason for his termination—White's failure to report the fight—was a mere pretext. A key underpinning of the court's decision was its characterization of White's role as a manager: "Here, Plaintiff has proffered no evidence of other management employees who were not fired but who failed to report a fight. . . . Plaintiff was a manager, and his role in enforcing workplace rules was key." (*Id.* at Pg. ID #641). Because White failed to identify any comparable managers and because the essential underlying facts of White's own conduct were undisputed, the district court found that no reasonable jury could conclude that White was a victim of racial discrimination. (*Id.* at Pg. ID #642).

### DISCUSSION

"We review a [district court's] grant of summary judgment *de novo*, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

### I.    White's Title VII Claim

White's first claim is that his termination by Duke Energy was an act of discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. To successfully prosecute a Title VII claim, "a plaintiff must either provide direct evidence of discrimination or establish a *prima facie* case, which creates an inference of discrimination based on circumstantial evidence." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). A *prima facie* case

requires a plaintiff to present evidence that: (1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was professionally qualified for the position he held at the time of the action; and (4) that he was either replaced by a person from outside the protected class or was treated differently from similarly situated employees outside the protected class. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 607, 610 (6th Cir. 2002).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant, who must then offer a legitimate, nondiscriminatory reason for the adverse employment action at issue. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant makes that proffer, then the burden shifts back to the plaintiff, who must present evidence that the proffered reason is a mere pretext for discrimination. *Id.*

The district court correctly ruled that White had established a *prima facie* case of racial discrimination under Title VII. Duke Energy does not dispute that: (1) White was an African-American and therefore a member of a protected class; (2) White suffered an adverse employment action in the form of a termination; (3) at the time of his termination White was qualified for his position of Work Management Planner; and (4) White's replacement was Caucasian.

Duke Energy argues on appeal that it proffered the legitimate, non-discriminatory reasons that White "failed to report the fight or that injuries had been sustained during the fight and he failed to report what he had been told about the fight during his initial interview." (Appellee's Br. at 13). In granting the motion for summary judgment, the district court characterized the proffered reason in a slightly different way: "Plaintiff failed in his management capacity to report a fight, in violation of a number of company rules." *White v. Duke Energy Kentucky, Inc.*, 1 F.

Supp. 3d 808, 815 (S.D. Ohio 2014). Under either formulation, Duke Energy satisfied its burden to produce a legitimate, non-discriminatory reason for White's termination, because it is a reason "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

The main issue on appeal is whether White created a genuine issue of material fact so that a reasonable jury could conclude Duke Energy's proffered reason was pretextual. White argues that Duke Energy's proffered reason was pretextual. (Appellant's Br. at 21). He contends that he was treated less favorably than similarly-situated, non-protected employees. (*Id*.) Duke Energy's response is that White "cannot identify a single non-minority who was similarly situated in all respects but treated better." (Appellee's Br. at 15).

When showing that a proffered reason for a termination was pretextual, a plaintiff can rely on "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008). Both White and Duke Energy characterize the issue as one of "similarly-situated employees," as the phrase is explained and interpreted in the line of cases stemming from *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992), and *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998). To date, this Circuit has only explicitly applied the standard of "similarly-situated" employees to the fourth prong of the test for a *prima facie* case under Title VII. *See Mitchell*, 964 F.2d at 582-83; *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 392–97 (6th Cir. 2008). However, White explicitly argues, and Duke Energy implicitly agrees, that the standard should be the same for the third prong of

the test for rebuttal of a proffered non-discriminatory reason. (*See* Appellant's Br. at 23). Given that the standard for "similarly-situated employees" seems broadly compatible with the type of evidence described as sufficient in *Madden*, *see* 549 F.3d at 676, we are persuaded that the standard for judging comparable employees should be consistent throughout each stage of the *McDonnell Douglas-Burdine* analysis, and we will assess the sufficiency of White's rebuttal by determining whether his proposed comparators are "similarly situated employees" within the meaning of the *Mitchell-Ercegovich* line of cases.

In ruling that White had not identified any similarly situated employees, the district court's key finding was that White had not proffered any evidence of other management employees who were not fired but failed to report a fight. As a factual matter, this finding is essentially correct. White has conceded that he is a management employee, and the only management employee that White proffered as a similarly situated employee was Hyland, the Maintenance Supervisor. But White can only argue that Hyland was somewhat dilatory in reporting the altercation to Human Resources (*see* Appellant's Br. at 9); he cannot dispute the fact that Hyland was the individual who ultimately informed Taylor about the altercation and indirectly triggered the internal investigation.[1] Given Hyland's role in reporting and investigating the altercation, his conduct was not substantially similar to White's actions. Therefore, Hyland is not a similarly situated employee who can be used to rebut Duke Energy's proffered reasons for White's termination.

But White's failure to proffer other management employees as similarly situated comparators is only fatal to his claim if he is legally unable to proffer non-management employees as similarly situated comparators. Courts "should make an independent

---

[1] At worst, it appears that Hyland waited roughly a week, until Taylor visited East Bend Station on unrelated business, before informing her.

determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee [being offered for comparison]." *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (quoting *Ercegovich*, 154 F.3d at 352). The plaintiff and proposed comparator need only "be similar in all of the *relevant* aspects." *Id.* This Circuit has clarified that earlier language requiring a comparator to "have dealt with the same supervisor," *Mitchell*, 964 F.2d at 583, "has never been read as an inflexible requirement." *McMillan*, 405 F.3d at 414 (quoting *Seay*, 339 F.3d at 479); *see also Seay*, 339 F.3d at 479–80 (finding that a comparator was similarly situated even though he worked in a different department and had a different supervisor).

Although he has conceded his status as a member of management, White has contested whether his management status was relevant to his actions and the proceedings that led to his termination. Based on the limited record before us, none of the company policies cited in connection with the decision to terminate White appear to make meaningful distinctions between management and other union or non-union employees. The district court claimed that as a manager, White's "role in enforcing workplace rules was key" (R. 32 Pg. ID #641), but this bare assertion contains no citation to the record and Duke Energy has not pointed to any support for a blanket obligation of rule enforcement common to all management employees.[2] White has consistently maintained that he did not supervise anyone or receive any supervisory or management-specific training; no evidence is apparent in the record that contradicts that assertion and some evidence supports it. (*See* Human Resources Investigation, App. #77). It may well be the case that unionized employees are held to different standards of conduct than management, even management without supervisory responsibility, and that union members

---

[2] Nor was such a management-specific obligation cited in the course of White's termination.

enjoy additional protections and opportunities for recourse in the wake of an internal investigation. But no evidence of those distinctions is apparent in the record, and given the paucity of the record and the district court's analysis, the relevance of White's status as management appears to be a contested material fact, and "*Mitchell* [and its progeny] cannot apply to cases, such as this one, in which the nonmoving party contests material facts." *Hamilton v. General Elec. Co.*, 556 F.3d 428, 437–38 (6th Cir. 2009).

Of course, if White has failed to proffer non-management employees who are otherwise similarly situated, then any premature restriction of comparators to management employees has no effect on the disposition of White's claims. White has pointed to four non-management employees as potential comparators: Don Calhoun, Norb Lankheit, Mark House, and Duane Doyle. All four of those individuals were Caucasian union members who were not disciplined by Duke Energy for their involvement with the altercation and subsequent investigation.

Calhoun and Lankheit were employees who heard rumors about the altercation. Neither of them had first-hand knowledge of the altercation or direct interactions with the parties involved. Neither of them failed to be forthcoming with the committee, although they were unable to contribute much information to the investigation. (*See* Appellee's Br. at 17–18). Calhoun and Lankheit's actions are not substantially similar to those of White, and therefore they are not similarly situated employees.

House was a coworker of Doyle. Several days after Doyle's altercation with Duty, House noticed bruises on Doyle and inquired about their origin. Doyle told House about the altercation, and House in turn reported the altercation to Hyland. White argues that if Hyland was not dilatory in reporting the matter to Taylor, then House must have sat on his information for roughly a week before making his report to Hyland. (*See* Reply Br. at 9–10). But House, like

Hyland, cannot be accused of a complete failure to report an act of workplace violence. House's actions are not substantially similar to those of White, and therefore he is not a similarly situated employee.

The strongest candidate for comparison among non-management employees is Duane Doyle. Like White, Doyle arguably failed to report the altercation to management. Duke Energy argues that Doyle fulfilled his reporting responsibility by reporting the matter to White. (*See* Appellee's Br. at 19). But a reasonable factfinder might not characterize White's observation of the altercation and subsequent inquiries as a "report" made by Doyle. Doyle's abortive efforts to enlist White in an effort to sweep the incident under the rug could also be reasonably construed as a violation of his responsibility to report the altercation.

Furthermore, there is also evidence to suggest that Doyle, like White, was not completely forthcoming in his initial meeting with the investigative committee. While Doyle did provide his version of the altercation (*see* Fact Finding Investigation Notes, App. #67), he did not tell the committee about his direct and indirect efforts to hide the severity of the incident from management and his attempts to enlist White in those efforts. Despite this omission, when directly asked if he had any other important information about the matter, Doyle said, "No." (*Id*. at #68). Therefore, a reasonable factfinder might be able to conclude that Doyle's behavior during his initial committee interview was comparable to White's behavior, particularly when coupled with Doyle's arguable failure to report the incident to management.

Finally, Doyle's employment history and past issues with dishonesty are comparable with White's history. While these issues were not mentioned in White's official termination notice (*see* Non-Union Corrective Action Notice, App. #35), and Taylor later said that White would have been terminated even without the letters in his employment file (*see* HR Investigation

Interview Documentation, App. #72-73), there is evidence to suggest that the perception of White's past dishonesty carried weight with the Investigative Committee. (Taylor Deposition, R. 20 Pg. ID #327 ("he had a history of not telling the truth"); Dilz Deposition, R. 22 Pg. ID #440 (referring to a "trend" of falsification by White)). According to this Circuit's "modified honest-belief" rule, the Committee was entitled to "reasonable reliance on the particularized facts that were before it at the time the decision was made," *see Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006), although the evidence suggests that the falsification charge against White was downgraded to a simple case of unapproved flextime. Even so, the undisputed fact remains that White and Doyle each had one documented charge of falsification. In terms of past difficulties with honesty, then, a reasonable factfinder might conclude that White and Doyle were comparable. If anything, Doyle's history was arguably the more aggravated of the two, since only Doyle had a Last-Chance Letter in his file. (Human Resources Investigation, App. #7). Yet Doyle's history did not cause him to be terminated for failing to report the altercation or failing to fully account for his actions in the aftermath of the altercation.

Perhaps the most significant and probative evidence that Doyle could be a similarly-situated comparator comes from the Recourse Investigation into White's termination. Though HR consultant Joyce McClure ultimately sided with management in its decision to terminate White, she specifically "recommended that management re-examine the decision regarding Duane Doyle and that he, too, may not have fully lived up to management expectations as it relates to reporting an injury." (Human Resources Investigation, App. #79). A reasonable factfinder could regard this as credible evidence that even a HR representative of Duke Energy had concerns that White had received less favorable treatment than a similarly-situated employee who had failed to follow corporate policies in comparable ways.

Since a reasonable factfinder could conclude that White was similarly situated in all relevant aspects to Doyle and that White was treated less favorably than Doyle, a reasonable factfinder could conclude that Duke Energy's proffered reason for termination was pretextual—but only if non-management employees can be considered similarly situated for purposes of White's Title VII claim. Because the present record does not allow us to determine whether White's status as a management employee was a relevant aspect of his employment for the purpose of limiting the pool of possible comparators, the district court erred by discounting the possibility that Doyle was a similarly situated employee and proper comparator.

Therefore, the grant of summary judgment on White's Title VII claim was erroneous. On remand, the district court should develop and expand the record on the relevant distinctions between Duke Energy management and employees at East Bend Station, including but not necessarily limited to: (1) whether the Duke Energy policies cited in connection with White's termination apply equally to management and union employees; (2) whether White possessed training or responsibilities that would make his management status relevant to an inquiry as to whether he could be properly compared to non-management employees; and (3) whether union members or other non-management employees enjoyed additional protections or opportunities for recourse in the wake of internal investigations such as the one that led to White's termination.

## II.    White's Kentucky Civil Rights Act Claim

White's second claim is that his termination was an act of racial discrimination in violation of the Kentucky Civil Rights Act, K.R.S. §§ 344.040(1)(a) and 344.450 ("KCRA"). In interpreting and enforcing these state provisions, the Supreme Court of Kentucky has embraced the *McDonnell Douglas-Burdine* burden shifting analysis and cited Sixth Circuit precedent on the issue of pretext. *See Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495–98 (Ky. 2005).

Thus, we regard our analysis of White's Title VII claim as dispositive of White's KCRA claim and find that the district court erred by entering summary judgment on the KCRA claim.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment for Duke Energy and **REMAND** for further proceedings to develop the factual record.

GRIFFIN, Circuit Judge, dissenting.

I respectfully dissent. I would affirm the district court's ruling that plaintiff Eric White failed to sustain his burden of demonstrating pretext in defendant Duke Energy's legitimate, nondiscriminatory reason for terminating White's employment. The undisputed facts are that White, as a member of management, not only failed to report a fight between two employees that resulted in one of the employees being injured, but that he also withheld information about the altercation from interviewers during the initial stages of the investigation. Because White can neither point to any similarly situated comparators who were treated differently for engaging in the same behavior, nor establish pretext because he has provided no evidence of discriminatory animus and admits to the violations of company policies that led to his termination, his circumstantial claim alleging race discrimination under Title VII fails as a matter of law.

Under the *McDonnell Douglas* burden-shifting framework, White may demonstrate pretext by showing that Duke Energy's proffered reason (1) has no basis in fact, (2) did not actually motivate his discharge, or (3) was insufficient to warrant the challenged conduct. *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation and internal quotation marks omitted). "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (emphases and quotation marks omitted).

Here, White asserts that Duke Energy's proffered reason was insufficient to justify his termination. This method usually "'consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Johnson*, 319 F.3d at 866 (quoting *Manzer v. Diamond Shamrock Chems. Co*., 29 F.3d 1078, 1084 (6th Cir. 1994)). In other words, White must establish that he was treated less favorably than similarly-situated, non-protected employees. *Manzer*, 29 F.3d at 1084.

Our court has explained that the plaintiff and a comparable employee must be similar in all of the relevant aspects in order to be similarly situated. *Johnson*, 319 F.3d at 867. "In the disciplinary context, we have held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of comparable seriousness." *Wright v. Murray Guard, Inc*., 455 F.3d 702, 710 (6th Cir. 2006) (emphases and citation omitted); *see also Martinez*, 703 F.3d at 916–17. Relevant factors for comparison purposes include the employees' conduct, employment standards, and whether the employees have dealt with the same supervisor. *Wright*, 455 F.3d at 710. "Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." *Rutherford v. Britthaven, Inc*., 452 F. App'x 667, 672 (6th Cir. 2011) (citation omitted). "District courts are to make independent determination[s] as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Khamati v. Sec'y of Dep't of the Treasury*, 557 F. App'x 434, 439 (6th Cir. 2014) (citation and internal quotation marks omitted).

In the present case, the district court determined that the proper comparators were other management employees and held that "[p]laintiff has proffered no evidence of other management employees who were not fired but who failed to report a fight." The majority concludes that the

district court's finding "is essentially correct" because "White has conceded that he is a management employee, and the only management employee that White proffered as a similarly situated employee was [Bill] Hyland, the Maintenance Supervisor[,]" whose "conduct was not substantially similar to White's actions." Nonetheless, the majority holds that the district court's grant of summary judgment to Duke Energy was erroneous at this stage of the proceedings because "the relevance of White's status as management appears to be a contested material fact" and White has successfully offered one non-management employee—Duane Doyle—as a suitable comparator. I disagree.

White's management position is clearly relevant to the disciplinary action taken in this case. White testified at his deposition that as a member of management, he was responsible for understanding Duke Energy's rules of conduct and disciplinary policies and enforcing them, including reporting harassment, safety threats or incidents, and violence. Significantly, he admitted that he failed to report the altercation between Duty and Doyle and, further, that he initially withheld information during the investigation, thus providing a legitimate, nondiscriminatory ground for his termination.

Moreover, White was not similarly situated to Doyle in all relevant respects. White was an at-will management employee and reported to George Dilz. White is not comparable to Doyle, who was a member of the union covered by a collective bargaining agreement, did not report to the same supervisor as White, did not undergo the same management training, or share the same management responsibilities as White. The district court aptly observed that "[p]laintiff was a manager, and his role in enforcing workplace rules was key." As noted above, White himself acknowledged that as a manager, he should have—but did not—carry out his managerial duties to report the altercation.

The significance of management status has been recognized by our court in several cases in which we have held that supervisory and non-supervisory personnel are not similarly situated. *See Martinez*, 703 F.3d at 917 (holding that store manager was not similarly situated to its assistant manager for purposes of assessing manager's claim that her termination for making inappropriate racial comments constituted reverse discrimination); *Rutherford*, 452 F. App'x at 672 ("[B]ecause [the non-supervisory employees] are not similarly situated to Rutherford [the supervisor-plaintiff], the fact that they were not terminated does not demonstrate pretext."); *Quinn-Hunt v. Bennett Enters., Inc.*, 211 F. App'x 452, 459 (6th Cir. 2006) ("Stickley is a supervisory employee, and Quinn–Hunt is not. . . . This weighs against a finding that they are similarly situated."); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) ("Pierce [the plaintiff] and Kennedy [the comparator] were not similarly situated. Unlike Ms. Kennedy, Pierce was a member of management, having . . . responsibility for maintaining a respectful, respectable, and decorous office. Thus, defendant had reason to treat Pierce differently than his subordinates, in requiring a larger measure of sensitivity and decorum.").

Likewise, Duke Energy had good reason to expect that White, as a manager, had greater responsibilities than Doyle to enforce the code of conduct at the facility: "[White's] role as a manager . . . could reasonably justify holding [him] to a more stringent standard of conduct than that applied to [Doyle]." *Martinez*, 703 F.3d at 917; *see also Pierce*, 40 F.3d at 805 ("[T]he evidence shows that Pierce was transferred for only one reason: he admitted to participating in actions which were not only inappropriate for him as a manager, but which violated [the employer's] sexual harassment policy"). Accordingly, because Doyle was not similarly situated to White, the fact that he was not terminated does not demonstrate pretext.

Although White argues that Duty and Doyle also failed to report their fight to management, this is not supported by the record—they both told White, who was a manager. The fact that they told White about the fight, that White failed to do anything about it, and that White lied to the investigatory committee is exactly what led to White's termination.

In sum, because the district court properly held that White failed to demonstrate that the reason for termination was pretextual, I would affirm the summary judgment granted in favor of Duke Energy.