RENDERED: DECEMBER 11, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0222-MR

ELAINE HUGHES                                                    APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.      HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
ACTION NO. 16-CI-002098


NORTON HEALTHCARE, INC.                                          APPELLEE


OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE: COMBS, JONES, AND MCNEILL, JUDGES.

JONES, JUDGE: Appellant, Elaine Hughes ("Hughes"), appeals the order of the

Jefferson Circuit Court, which granted summary judgment to Appellee, Norton

Healthcare, Inc. ("Norton"), on claims of retaliation under KRS[1] 216B.165,

---

[1] Kentucky Revised Statutes.

wrongful discharge in violation of KRS 216B.165, and intentional infliction of emotional distress following her termination.

Having reviewed the record in conjunction with all applicable legal authority, we affirm the circuit court's summary judgment on Hughes's claims of retaliation and intentional infliction of emotional distress. We reverse the circuit court's judgment with respect to Hughes's claim for wrongful discharge in violation of public policy and remand for additional analysis and factual findings.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Until the events giving rise to this litigation occurred, 55-year-old Hughes was employed by Norton as an Assistant Nurse Manager ("ANM"). Hughes began working at Norton in 1987 as a staff nurse in the obstetrics and gynecology departments. Over the years, she did her job well and received several promotions, culminating in her promotion to ANM for the hospital's Operating Room ("OR") in 2010.

As an ANM in the OR, Hughes's duties were largely managerial, and she rarely scrubbed in on cases. Instead, Hughes ran the Surgery Scheduling Board, meaning she organized the flow of cases in the OR, scheduling nurses and coordinating with surgeons, anesthesiologists, and other hospital professionals to do so. Hughes's additional responsibilities included scheduling staff, handling some payroll duties, meeting with other ANMs weekly, and working an on-call

shift one weekend approximately every five weeks. As an ANM, Hughes was an at-will employee, and she understood that Norton could terminate her employment at any time, with or without cause.

In March of 2015, Kimberly Ransdell was hired by Norton as the Surgery Manager. This made Ransdell Hughes's direct supervisor. Ransdell reported to Pam Photiadis, the Director of Surgical Services. Both Ransdell and Photiadis agreed that Hughes was a good nurse and well-qualified for her position. According to Photiadis, Hughes was a "fine woman" but had at times exhibited poor judgment in her employment. Hughes received a disciplinary corrective action in 2010 prior to Ransdell's becoming her direct supervisor and several "coachings" from Ransdell regarding scheduling in the OR in the spring and summer of 2015.

In May of 2015, just months after Ransdell became Surgery Manager, Ransdell recorded notes of several "coaching" meetings she conducted with Hughes. According to Ransdell, keeping coaching notes was common practice for supervisors, and she did so for all the ANMs under her supervision. In May, Ransdell documented that she met with Hughes to discuss improving Hughes's working relationship with anesthesia with regard to scheduling cases in the OR. The two met again in June to address comments Hughes made to a Norton surgeon about getting her hands "slapped" during the May coaching. In October, Ransdell

met with Hughes twice more to discuss an incident in which Hughes "bumped" a patient's OR time for a non-emergency case, causing the patient's surgery to be cancelled for a second time and postponed until the second day. Ransdell did not take any written corrective action related to these notes, nor did she provide Hughes with a copy of the notes. Hughes claims in her post-deposition affidavit that these meetings did not take place.

Hughes was known by her supervisors and coworkers to voice her opinions, which she did in spring of 2015 when she became aware that Norton's OR was unprepared to deal with an increasing rate of obstetrical issues. Hughes was particularly alarmed by an increase in cases involving placenta accreta, a serious and often sudden pregnancy complication that can result in severe blood loss following delivery. Hughes had observed a growing trend in accreta patients being transferred from the Labor and Delivery section of the hospital to the OR without notice and believed that the OR needed a plan in place for handling these emergency cases. Other Norton employees shared the same patient safety concerns, including Ransdell and Photiadis; Hughes was not alone.

In particular, Hughes was involved in two incidents in which patients with severe obstetric complications arrived in the Norton OR without warning. The first occurred in late spring or early summer of 2015, when Labor and Delivery called Hughes in the OR to tell her that they were bringing an accreta

patient into the OR immediately, without ensuring that there was a clean room available before doing so. The second incident also occurred that summer when Labor and Delivery sent a patient to the OR for monitoring and testing, neither of which were ordinary functions of the OR.

After the second incident, Hughes was asked to meet with Risk Management in a nondisciplinary capacity to address what had happened. To her knowledge, Hughes was the only employee to meet with Risk Management about obstetric issues. During that meeting, Risk Management acknowledged that there was a "disconnect" in communication between Gynecology and the OR. Although that particular event had not involved an accreta patient, Hughes also voluntarily brought up her concerns regarding the accreta issue.

Hughes testified that she also reported one or both of the incidents to a number of Norton employees: Ransdell, Photiadis, the Gynecology ANM Theresa Vincent, Norton Anesthesia, Risk Management, and several other ANMs. The other Norton employees all agreed that the OR needed a specific plan for dealing with accreta patients to ensure patient safety. Both Ransdell and Photiadis testified that they encouraged Hughes to raise the issue. According to Photiadis, not only was Hughes not in trouble for reporting the accreta issue, she was a part of the solution to the problem. It was Norton's policy to encourage reporting patient care and safety issues, and employees commonly did so.

Later that summer, Hughes, Ransdell, anesthesia, Labor and Delivery, and other employees met to discuss a plan for handling accreta patients. Hughes testified that she was aware that Vincent created a designated "accreta cart" containing all of the necessary instrumentation and supplies for handling accreta cases. The parties dispute whether Hughes's concerns were addressed by fall of 2015, when Hughes was terminated. Hughes claims to have continued her complaints until then; Photiadis, however, testified that a plan had been formulated to address the accreta issue by 2016.[2] However, Photiadis admitted that a written plan was not established until 2017.

On Friday, October 30, 2015, Hughes was scheduled to be the on-call ANM for the weekend shift ending the morning of Monday, November 2, 2015.[3] Hughes said that being on-call as an ANM required "answer[ing] questions, phone calls, [and] trouble-shoot[ing] if there was an issue in surgery." Appellant's Br. Exhibit 1, Hughes Dep. at 20. According to Ransdell, Hughes was to support the staff in whatever way was needed, whether that be coming into the hospital to help

---

[2] Norton's new policy called for the OR to be notified any time that a potential accreta patient was in the building so that the OR staff could "huddle" to determine who would be in charge of the patient if the patient's condition became exigent.

[3] It is unclear what time Hughes's shift actually began. Ransdell and Photiadis report that Hughes's shift began around 4:00 or 4:30 p.m. because she was serving as the back-up for a new ANM still in orientation at the hospital. Hughes contends that her shift did not begin until 10 p.m., although she was still to answer any questions from the new ANM until then. Norton's payroll system shows that Hughes worked her regularly scheduled shift from 5:35 a.m. to 4:02 p.m. and was paid for 12.58 on-call hours on October 30, 2015.

-6-

in the OR or making phone calls from home. Norton's On-Call Policy requires employees to "be available" for emergencies and "to return to work or respond to telephone inquiries, as needed." Ransdell Dep. Ex. 5.

That night, Hughes went to a Halloween party. Hughes testified that she had a "vodka diet cherry 7-Up" around 6:30 p.m. while getting ready for the party. Appellant's Br. Exhibit 1, Hughes Dep. at 44. Hughes testified that her behavior was not unusual – she would routinely have a glass of wine or a cocktail while on-call.[4] She and her then-boyfriend/now-husband, Luke Howard, arrived at the party between 8:30 and 8:45 p.m. While at the party, Hughes had a vodka mixed drink at approximately 9 p.m. and half a shot of tequila around 9:15 p.m.

Hughes and Howard left the party sometime between 11 p.m. and midnight and went to Howard's home for the night. There, Hughes became ill, which she later attributed to food she ate at the party. Hughes took half a Phenergan, a prescription medication known for its sedative and antiemetic effects, to alleviate her nausea. Hughes was aware that Phenergan can have a sedative effect. Hughes then went to bed. At no point did Hughes ask someone to cover her on-call shift.[5]

---

[4] Hughes has alleged that many other Norton employees also drank alcohol while on-call, but she presented no evidence other than her own subjective belief to support this allegation.

[5] On appeal, the parties both agree to this sequence of events. However, both parties' accounts regarding the amount and types of alcohol Hughes consumed varied throughout the course of Norton's investigation.

At 1:05 a.m., Marsha Sharp, the House Supervisor at Norton, called Hughes for help dealing with a hospital emergency. A female patient, bleeding profusely after having recently given birth to twins, had just arrived in the OR for emergency intervention while Sharp was already dealing with a patient in cardiac arrest. Sharp had tried to contact the on-call team to handle the emergency but could not locate the surgical tech on-call, Erica Webb.[6] Sharp called Hughes regarding her inability to contact Webb, but Hughes told Sharp to keep trying to reach Webb. Hughes testified that, during that brief two-minute phone call, she gave Sharp the names of several techs who typically took night calls or worked emergencies to call for help. However, Sharp wrote in her notes from that night that Hughes only told her to "call ST [surgical tech] again."

Sharp called Hughes two more times at 1:25 and 1:33 a.m. regarding the emergency situation. These phone calls lasted a combined total of three minutes. According to Sharp's notes, Sharp called Hughes at 1:33 a.m. to inform her that they had no surgical tech or anesthesiologist in the OR; they had had to borrow staff from obstetrics until the situation was resolved and their own staff

---

[6] Webb was suspended pending an investigation into why she did not respond when she was on-call. The investigation revealed that Sharp had repeatedly dialed the incorrect phone number for Webb. The investigation concluded with a determination that Webb had not failed to respond as she had never been contacted; she was not disciplined.

could come in.  Hughes did not ask if the situation was resolved or check back in with Sharp at any time.

Around 2:00 a.m., Sharp called Photiadis for assistance.  Photiadis instructed Sharp to call Ransdell, Hughes's immediate supervisor, to come in and assist.  Sharp did so, and Ransdell promptly reported to the hospital.  On her way, Ransdell called Hughes to ask for help.  According to Ransdell, Hughes's voice sounded very groggy when she answered the phone.  Ransdell testified that she asked if Hughes was on her way in to assist with the emergency situation or was trying to get someone to come in, but Hughes was unresponsive and the "phone went dead."  Appellant's Br. Exhibit D, Ransdell Dep. at 154.  Ransdell stated, "I was trying to ask for her assistance.  I needed some assistance.  I couldn't drive, make calls.  I couldn't – I didn't know who was in there.  I needed her help to fill in with the patient."  *Id*. at 158-59.  Once Ransdell arrived at the hospital, she scrubbed into the case and replaced the obstetrics technician who had helped start the case.  According to Ransdell, Hughes "could have scrubbed in and got[ten] the case started," although Hughes later clarified that she did not have the requisite training to scrub in on such a case.  *Id*. at 94-95.

Hughes was never asked to come into the hospital to assist, nor did she offer to do so; she did not follow up on the emergency situation or volunteer her services in any other way.  Both Hughes and Ransdell agree that if Hughes had

-9-

come into the hospital, she could have been tested for possible intoxication or impairment. However, Ransdell was not aware that Hughes had consumed alcohol and Phenergan until Sunday, November 1, when Hughes called Ransdell regarding the events of October 30-31, 2015. Hughes admitted to not having been on her "A game" when Sharp and Ransdell called her and that she had consumed "a couple of drinks" and had "[taken] a Phenergan for nausea." Exhibit 9; Appellant's Br. Exhibit A, at 62. Ransdell testified that she was stunned by Hughes's admissions and told Hughes that she would have to talk to Photiadis. However, Hughes contradicts this testimony, alleging that Ransdell said that they would use the previous night's events as a "learning opportunity." Appellant's Br. Exhibit A, at 68.

On the morning of Monday, November 2, 2015, Ransdell informed Photiadis about Hughes's admissions to drinking alcohol and taking Phenergan while on-call. Ransdell told Photiadis that she was uncomfortable with what she had learned because Hughes knew she was on-call and "had drank enough to get sick while a patient was bleeding badly and had to wait for over an hour for a team to come in for the surgery." Appellant's Br. Exhibit D, at 68. Photiadis spoke with Hughes, who admitted she had been at a party, had been drinking, and became ill. Ransdell and Photiadis agreed that it was a serious event and called Norton's

Chief Nursing Officer ("CNO"), Steven Brockman-Weber, as well as Norton's HR Representative, Allison Goatley.

Hughes was placed on administrative leave that day so that Goatley could conduct an independent investigation. Goatley spoke with Ransdell, Photiadis, and Hughes throughout her investigation process but did not consult any of the other Norton employees involved in the incident. Both Hughes and Ransdell gave inconsistent accounts of the weekend's events.

Goatley testified that Ransdell reported to her that Hughes had consumed several drinks, several shots, and a full Phenergan and that Hughes was "unable to perform the duties of her job" the night of October 30-31, 2015.[7] Appellant's Br. Exhibit E, at 31. Ransdell told Goatley that "Hughes seemed to have been woken up by [Ransdell's] call, that she was extremely groggy, and that she could hardly articulate what she had done or what she had said to Marsha Sharp over the phone." *Id*. at 52. Goatley also interviewed Hughes over the phone. Hughes did not dispute that she was on-call when the incidents occurred. Goatley testified that Hughes admitted on the phone that she had attended a Halloween party, had "several drinks" and "one shot of liquor," and had then taken

---

[7] In her coaching notes from October 31, Ransdell recorded a different account. She wrote: "[Hughes] had went out with her friend and had had drinks and not eaten very much and then went to another location and had shots and had gotten sick. Her boyfriend brought her home and she took a ½ Phenergan to stop vomiting." Appellant's Br. Exhibit F.

"half a Phenergan." Appellant's Br. Exhibit 6, at 35, 40. She also admitted that she was drowsy when Sharp and Ransdell called her for assistance. However, later that afternoon, Hughes emailed Goatley a different set of facts than Goatley recalled from the phone conversation. In her email, Hughes wrote that she had only had two drinks and a half a shot of tequila and for the first time claimed to have eaten some food that had been sitting out for several hours, which allegedly caused her sickness. Goatley asked clarifying questions of both Hughes and Ransdell and considered the credibility of their reports to her. She found Ransdell to be the more credible witness, noting Hughes's inconsistent story.

To complete her investigation, Goatley reviewed Norton policies, including Norton's Drug and Alcohol and On-Call Policies. Norton's Drug and Alcohol Policy does not explicitly prohibit consuming drugs or alcohol while working, but it does prohibit taking legally prescribed drugs while working if those drugs impair an employee's ability to perform the duties of their job. She also reviewed Hughes's personnel file but testified that the prior corrective actions only played a "minor role" in the termination decision.

Goatley ultimately recommended to Photiadis that Hughes be terminated, basing her decision largely upon Hughes's own report. Exhibit 6 at 114-15. At the time of her decision, Goatley was not aware that Hughes had made complaints regarding patient safety. Rather, Goatley determined that Hughes had

violated Norton's Drug and Alcohol Policy, "put[ting] patient safety in harm's way as a result of her behavior." Goatley Dep. at 98. Goatley reasoned that "it is widely known that medical professionals should not be partaking in alcohol use while on-call," characterizing Hughes's conduct as "egregious," and concluded that Hughes had been impaired and unable to perform the duties of her job. *Id*. at 114-15. In their phone conversation, Hughes "seemed to acknowledge both that she was impaired . . . and that she knew that she had failed to complete her duties as an ANM on-call." *Id*. Photiadis spoke with Brockman-Weber about the decision to terminate Hughes but did not discuss it with Ransdell.

In a meeting on November 11, 2015, Hughes was terminated for taking prescription medication and consuming alcoholic beverages. Hughes's corrective action record from the incident additionally noted that Hughes had failed to ask for coverage when she became sick and took Phenergan. No one affiliated with Norton told Hughes that she was being terminated for reporting any kind of patient safety issue, nor did Hughes suggest at the time that she felt that that was the reason.

According to Hughes, Norton's decision to terminate her was out of the ordinary compared to other Norton employees disciplined for similar behavior. Hughes first points to Walter Hare, a former Norton employee who missed work and was suspected to have been under the influence of drugs or alcohol. Hughes

herself asked Hare to come into the hospital to be tested, but he refused. Although Hughes believed that Hare was terminated later for unrelated reasons, Photiadis testified that Hare was in fact terminated for refusing to take the drug test. Hughes also claims to have been treated differently than another surgical technician named Adam Green, who was disciplined but not terminated for missing his on-call shift. Ransdell, however, clarified that Green was not terminated because there were two contradictory on-call schedules posted, and he legitimately believed he was not on-call. Hughes also alleges that other Norton employees have consumed alcohol while on-call but were not disciplined.

On May 6, 2016, Hughes filed suit in Jefferson Circuit Court, asserting retaliation pursuant to KRS 216B.165, wrongful discharge, and intentional infliction of emotional distress.

After several years of written discovery and deposition testimony, Norton filed its motion for summary judgment and supporting memorandum seeking an order and judgment dismissing each of Hughes's claims with prejudice.

Following a lengthy oral argument, the circuit court granted Norton summary judgment:

> Hughes has brought a claim for retaliation pursuant to KRS 216B.165, the statute which requires employees to report patient care issues. In order to prevail on such a claim, she must show that 1) she engaged in a protected activity; 2) Norton knew that she had engaged in a protected activity [sic] and 3) Norton terminated her

-14-

because of it. In order to prove the latter[,] there must be evidence that engaging in the protected activity was "the likely reason for the adverse action." *Kentucky Dep't of Corr. v. McCullough*, 123 S.W.3d 130 (Ky. 2003). No witness other than Hughes has testified that her reports regarding the accrete situation had anything to do with her termination.

In order to show causation, Hughes relies on two grounds. First, it is her belief that the fact that she was vocal about the accrete dispute resulted in her termination. Second, she contends that both events took place in 2015. However, an employer cannot be liable for retaliation when it "acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision." *Ladd v. Grant Trunk Western R. R., Inc.*, 552 F.3d 495 (6th Cir. 2009). Photiadis testified that the accreta dispute was not the reason for the termination (internal citation omitted).

Further, *Grzyb v. Evans*, 700 S.W.2d 399 (Ky. 1985), is fatal to Hughes's claim of public policy discharge. This case holds that the tort is preempted. The Court found that, "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." In this case, Hughes pleads the alternative claims of retaliation and public policy wrongful discharge, relying on the same facts for each claim.

In order to prevail on her claim for intentional infliction of emotional distress, Hughes must show that Norton's conduct was outrageous, that it was sufficiently outrageous to offend generally accepted standards, that her damages were caused by the conduct and that her emotional distress was severe. However, the case of *Benningfield v. Pettit Environmental, Inc.*, 183 S.W.3d 567 (Ky. App. 2005) holds that mere termination is insufficient to establish such a claim. Indeed, Hughes

testified in her deposition that the purpose of the termination was not to cause her emotional distress (internal citation omitted).  Further, she indicated that she never felt "down, depressed or hopeless" (internal citation omitted).  As there are no genuine issues of material fact, Norton is entitled to Judgment as a matter of law.

16-CI-002098 Opinion and Order at 3-4.

Hughes filed this appeal after the circuit court denied her motion to alter, amend, or vacate.

## II.   STANDARD OF REVIEW

"[S]ummary judgment is to be cautiously applied and should not be used as a substitute for trial."  *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc*., 807 S.W.2d 476, 483 (Ky. 1991).  A motion for summary judgment should only be granted "when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor" even when the evidence is viewed in the light most favorable to him.  *Id*. at 482; *Shelton v. Kentucky Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013).  "'Belief' is not evidence and does not create an issue of material fact.  A plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The standard of review on appeal from summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (citing *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); *Palmer v. International Ass'n of Machinists & Aerospace Workers*, 882 S.W.2d 117, 120 (Ky. 1994); CR[8] 56.03). "A trial court's decision to grant summary judgment for insufficient evidence is to be reviewed *de novo* on appeal." *Ashland Hospital Corporation v. Lewis*, 581 S.W.3d 572, 577 (Ky. 2019). On appeal, the record must be viewed in a light most favorable to the party who opposed the motion for summary judgment, and all doubts are to be resolved in his favor. *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009).

### III.   ANALYSIS

#### A.  Wrongful Discharge Claim

Hughes relies upon KRS 216B.165 as the basis for both her common law public policy wrongful discharge claim and statutory retaliation claim. She maintains that she was terminated for her patient safety complaints in violation of KRS 216B.165. The circuit court concluded that because Hughes's claims of retaliation under KRS 216B.165 and wrongful discharge under common law

---

[8] Kentucky Rules of Civil Procedure.

-17-

depended on the same facts, her common law wrongful discharge claim was statutorily preempted as a matter of law. We disagree.

"Under Kentucky law, an employer may ordinarily 'discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Follett v. Gateway Reg'l Health Sys., Inc.*, 229 S.W.3d 925, 927 (Ky. App. 2007) (quoting *Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)). Kentucky law also provides for a narrow public policy exception: "[an] employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." *Firestone*, 666 S.W.2d at 731 (quoting *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983)). "In the context of a wrongful discharge case, preemption occurs when the statutes that establish the 'well-defined public policy' violation which supports the wrongful discharge pleading are the same statutes that establish a statutory cause of action for, and structure the remedy for, violations of that public policy." *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 421 (Ky. 2010). Accordingly, we must examine the statute in question to determine whether it sets forth the remedy for any statutory violation.

KRS 216B.165 is Kentucky's healthcare whistleblower law. It reads:

(1) Any agent or employee of a health care facility or service licensed under this chapter who knows or has

-18-

reasonable cause to believe that the quality of care of a patient, patient safety, or the health care facility's or service's safety is in jeopardy shall make an oral or written report of the problem to the health care facility or service, and may make it to any appropriate private, public, state, or federal agency.

(2) Any individual in an administrative or supervisory capacity at the health care facility or service who receives a report under subsection (1) of this section shall investigate the problem, take appropriate action, and provide a response to the individual reporting the problem within seven (7) working days.

(3) No health care facility or service licensed under this chapter shall by policy, contract, procedure, or other formal or informal means subject to reprisal, or directly or indirectly use, or threaten to use, any authority or influence, in any manner whatsoever, which tends to discourage, restrain, suppress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any agent or employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the health care facility or service the circumstances or facts to form the basis of a report under subsections (1) or (2) of this section. No health care facility or service shall require any agent or employee to give notice prior to making a report, disclosure, or divulgence under subsections (1) or (2) of this section . . . .

KRS 216B.165(1)-(3).

KRS 216B.165(1) imposes a duty upon any employee or agent of a healthcare facility to report concerns regarding patient care and safety to the healthcare facility. KRS 216B.165(1). KRS 216B.165(3) further dictates that healthcare facilities are prohibited from retaliating against any employee or agent

who makes such a report in good faith.  KRS 216B.165(3).  The statute does not,

however, provide a remedy.  Rather, Hughes is able to maintain a retaliation suit

pursuant to KRS 216B.165(3) because of KRS 446.070.  KRS 446.070 provides

that "[a] person injured by the violation of any statute may recover from the

offender such damages as he sustained by reason of the violation, although a

penalty or forfeiture is imposed for such violation."  KRS 446.070; *MacGlashan v.*

*ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 601-02 (W.D. Ky. 2015).  The Kentucky

Supreme Court has further clarified:

> [Recovery under KRS 446.070] is limited to where the
> statute is penal in nature, or where by its terms the statute
> does not prescribe the remedy for its violation.  *Hackney
> v. Fordson Coal Co.*, 230 Ky. 362, 19 S.W.2d 989
> (1929).  Where the statute both declares the unlawful act
> and specifies the civil remedy available to the aggrieved
> party, the aggrieved party is limited to the remedy
> provided by the statute.  *See Trembath v. St. Regis Paper
> Co.*, 753 F.2d 603 (7th Cir. 1985); *Wolk v. Saks Fifth
> Avenue, Inc.*, 728 F.2d 221 (3d Cir. 1984); *Zywicki v.
> Moxness Products, Inc., Div. of Versa Tech.*, 610 F.
> Supp. 50 (D.C. Wis. 1985); *McCluney v. Jos. Schlitz
> Brewing Co.*, 489 F. Supp. 24 (E.D. Wis. 1980).

*Grzyb*, 700 S.W.2d at 401.

Norton argues that Hughes's cause of action pursuant to KRS

216B.165 has a statutory remedy via KRS 446.070, thus preempting her common

law claim.  In support of this position, Norton cites to *Grzyb v. Evans*, 700 S.W.2d

399, a 1985 case in which the Kentucky Supreme Court determined that the

-20-

statutory structure of KRS 344.040, Kentucky's employment discrimination statute, preempts any corresponding common law claim for wrongful discharge. *Id*. at 401. In *Grzyb*, Evans alleged that he had been wrongfully discharged from his employment contrary to public policy for fraternizing with another employee. *Id*. at 399. Our Supreme Court held that Evans's claim failed because KRS 344.040, the same statute creating the public policy Evans claimed his termination violated, already "prescribe[s] the remedy for its violation." *Id*. at 401. KRS Chapter 344 explicitly provides for the adjudication of complaints of discrimination by the Kentucky Commission on Human Rights. *Pucke v. J.A. Stevens Mower Co.*, 237 S.W.3d 564, 566 (Ky. App. 2007).

In 2010, the Kentucky Supreme Court rendered *Hill v. Kentucky Lottery Corp.*, clarifying what it deemed a fundamental "misunderstanding of *Grzyb* as it relates to the doctrine of preemption." *Hill*, 327 S.W.3d at 420. "*Grzyb* does *not* hold that preemption is triggered when the *same set of facts* that establishes a common law wrongful discharge claim also constitutes a claim under KRS Chapter 344." *Id*. (emphasis added). Rather, "[p]reemption was based on the fact that his sex discrimination claim was based on the *same law* as his wrongful discharge claim." *Id*. at 421 (citing *Grzyb*, 700 S.W.2d at 401-02). In other words, preemption is not caused exclusively by the similarity of the facts that underlie the respective causes of action.

> In the context of a wrongful discharge case, preemption occurs when the statutes that establish the "well-defined public policy" violation which supports the wrongful discharge pleading are the same statutes that establish a statutory cause of action for, and structure the remedy for, violations of that public policy.

*Id*.

With specific regard to whether a plaintiff may rely upon the same law to support simultaneous claims for retaliation in violation of statute and common law wrongful discharge in violation of public policy, we find *MacGlashan*, 84 F. Supp. 3d at 602, to be persuasive.[9] In *MacGlashan*, the federal district court for the Western District of Kentucky dealt with the exact issue before us today: whether a common law public policy wrongful discharge claim is preempted by a retaliation claim brought concurrently under KRS 216B.165. *Id*. at 601. In that case, a former nurse manager brought suit under both KRS 216B.165 and common law, claiming that she had been terminated by a hospital for reporting a patient safety concern. *Id*. at 598. The hospital argued that the nurse's common law claim for public policy wrongful discharge was preempted by her statutory claim. The court determined that the public policy wrongful discharge claim was

---

[9] State courts are not bound by decisions from lower federal courts; rather, "the approach taken by federal courts may be viewed as persuasive but it is not binding." *U.S., ex rel. U.S. Attorneys ex rel. Eastern, Western Districts of Kentucky v. Kentucky Bar Ass'n*, 439 S.W.3d 136, 147 (Ky. 2014).

not preempted, because KRS 216B depends on KRS 446.070 for recovery rather than its own terms. *Id*. at 601-02.

After a careful examination of KRS 216B, we agree with the *MacGlashan* court and are satisfied that there is no preemption – the chapter provides neither a cause of action nor remedy for its violation. *Id*. at 601; *see also Foster v. Jennie Stuart Med. Ctr., Inc.*, 435 S.W.3d 629 (Ky. App. 2013) (holding that a nurse's sole claim for wrongful termination based on violation of public policy under KRS 216B.165 was not preempted); *Tygrett v. Baptist Healthcare Sys., Inc.*, No. 2018-CA-001275-MR, 2019 WL 4565231, at *4 (Ky. App. Sept. 20, 2019) ("[KRS 216B.165] does not provide a cause of action or remedy. Rather, we agree with the rationale in *MacGlashan* . . . that Tygrett is able to maintain a retaliation suit pursuant to KRS 216B.165(3) because KRS 446.070 provides [a remedy]."). As a matter of law, the circuit court erred in dismissing this claim as preempted. As such, we reverse and remand for further proceedings on the issue of wrongful discharge before the circuit court.

### B. Retaliation Claim

KRS 216B.165 prohibits retaliation against healthcare workers who report patient safety concerns. "A claim for unlawful retaliation requires the plaintiff to first establish a *prima facie* case of retaliation, which consists of showing that '(1) she engaged in a protected activity, (2) she was disadvantaged by

an act of her employer, and (3) there was a causal connection between the activity engaged in and the [defendant] employer's act.'" *McCullough*, 123 S.W.3d at 133-34 (quoting *Kentucky Center for the Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. App. 1991) (internal citation omitted)).

In cases lacking direct evidence of retaliation, like the present case, the burden of production and persuasion follows the *McDonnell Douglas* framework. *Id*. at 134 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). In order to demonstrate a *prima facie* case of retaliation, Hughes bears the initial burden of showing (1) that she engaged in protected activity; (2) that her exercise of her rights was known by Norton; (3) that, thereafter, Norton took adverse action against her; and (4) that there was a causal connection between her protected activity and the adverse employment action. *Brooks v. Lexington-Fayette Urban County Housing Authority*, 132 S.W.3d 790, 803 (Ky. 2004); *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. If a *prima facie* case is established, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse action. *Handley*, 827 S.W.2d at 699. "[O]nce such a reason is given, it is incumbent on the employee to demonstrate that the stated reason is merely a pretext to cover the actual discrimination." *Id*.

The parties dispute only the fourth element of Hughes's *prima facie* case: whether Hughes provided sufficient evidence of a causal connection between her patient safety complaints and her termination. In order to show a "causal connection," Hughes must produce evidence that her protected activity was the "likely reason for the adverse action." *McCullough*, 123 S.W.3d at 135 (quoting *Nguyen v. City of Cleveland,* 229 F.3d 559, 566 (6th Cir. 2000)). Causal connection may be established through either direct or circumstantial evidence. *Id*. Here, Hughes relies on circumstantial evidence, so she must offer proof to establish that "(1) the decision-maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action." *Id*. Hughes argues that the record demonstrates a causal connection due to close temporal proximity, increased job performance scrutiny by Ransdell, and her disparate treatment compared to other employees.

In "rare cases, temporal proximity alone may suffice to show a causal connection." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Generally, there is no bright-line rule as to how close in time an adverse employment action must be to an employee's protected activity to show causal connection by temporal proximity alone. *See*, *e.g.*, *Asbury Univ. v. Powell*, 486 S.W.3d 246, 259 (Ky. 2016) (holding that temporal proximity exists when an

employer first took adverse action against a plaintiff the month after her last complaints); *McCullough*, 123 S.W.3d at 136 (holding that temporal proximity exists when just three days passed between the plaintiff's protected activity and her employer's first refusal to promote her); *MacGlashan*, 84 F. Supp. 3d at 601 (holding that when an employee was suspended the same day as her protected activity and terminated six days later, the adverse action was "immediate" enough to establish causal connection without additional evidence). "The Sixth Circuit has held that a three-month period between the protected activity and employee's termination is sufficient to create a causal connection for the purposes of establishing a *prima facie* case." *Goller v. Ohio Dep't of Rehab. & Correction*, 285 F. App'x 250, 257 (6th Cir. 2008) (citing *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004)). Conversely, this court has previously held that a five-month lapse of time between protected activity and adverse action requires "the court to view the time between the two events in the context of the entire circumstances" in order to establish a "close temporal relationship." *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 916 (Ky. App. 2006).

Hughes asserts that she continued her complaints up until the fall that she was terminated, contending that her meeting with Risk Management regarding the June obstetrical incident occurred "shortly before her termination." Appellant's Br. at 18. However, Hughes did not provide any evidence as to whom

or how she continued her complaints. Furthermore, the record suggests that Hughes's Risk Management meeting occurred in the late summer, meaning that this meeting and her termination were likely around three months apart.[10] We submit that this ambiguity necessitates "view[ing] the time between the two events in the context of the entire circumstances." *Upchurch*, 214 S.W.3d at 916.

"[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525. When temporal proximity alone is not enough to create a genuine question of material fact, a plaintiff can create sufficient inference of causal connection by showing close temporal proximity and that she was treated differently than other employees.[11] *Id.* ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant

---

[10] Hughes cites to *Wilson v. City of Central City*, No. 2008-CA-001547-MR, 2010 WL 135105 (Ky. App. Jan. 15, 2010), *aff'd*, 372 S.W.3d 863 (Ky. 2012), an unpublished case in which causal connection was established when an employer retaliated one year after the plaintiff filed a complaint. *Wilson* involved a whistleblower complaint under KRS 61.103(2), not a claim of retaliation under KRS 216B.165. Significantly, KRS 61.103(1)(b) provides that an employee is entitled to a presumption that disclosure was a "contributing factor" when adverse action occurred "within a limited period of time so that a reasonable person would conclude the disclosure was a factor in the personnel action." KRS 61.103(1)(b). KRS 216B.165 provides for no such presumption, and the standard for causal connection is that of "close proximity" as outlined by case law, rather than a "limited period of time."

[11] Hughes has acknowledged that other Norton employees voiced the same concerns as she did and they were not terminated.

enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that the plaintiff established causation by providing evidence that he began to be isolated by his coworkers and garnered frequent and unwarranted job performance criticism a couple of weeks after filing a race discrimination complaint).

"In order to show that a plaintiff is 'similarly situated' to another, the plaintiff is required to prove that all of the relevant aspects of their employment situation were 'nearly identical' to those of the 'similarly situated' employee." *McBrearty v. Kentucky Cmty. & Tech. Coll. Sys*., 262 S.W.3d 205, 214 (Ky. App. 2008). Hughes has offered evidence of one Norton employee who refused to take a drug test and two employees who did not report to their on-call shifts due to scheduling and contacting errors. None of these employees was similarly situated, as they held different positions than Hughes and were suspected of different misconduct.

Temporal proximity may also be paired with increased scrutiny to show the causal connection necessary to establish a *prima facie* case. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009). Ransdell was first hired by Norton in March of 2015 but did not record any notes regarding Hughes's job performance until May, the same month Hughes began her patient safety

complaints.[12]  While these coaching notes were warranted and unrelated to Hughes's patient safety complaints, the proximity with which they first occurred to Hughes's first complaints could suggest increased scrutiny.  Accepting this evidence in the light most favorable to Hughes, we conclude that Hughes established her *prima facie* case shifting the burden to Norton to "articulate with clarity and reasonable specificity, a reason unrelated to a discriminatory motive[.]" *Handley*, 827 S.W.2d at 700.

Norton has consistently maintained from the time of Hughes's discharge that she was terminated for drinking alcohol and taking Phenergan while on-call and for failing to respond appropriately when there was an emergency at the hospital during her on-call shift.  This is sufficient evidence to shift the burden back to Hughes.  Therefore, to prevent summary judgment, Hughes must demonstrate some genuine issue of material fact as to whether Norton's stated rationale for termination was merely pretextual.  *See Blair v Henry Filters, Inc.*, 505 F.3d 517, 531 (6th Cir. 2007).

Courts generally recognize three methods by which a plaintiff may establish pretext:  "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his [or her] discharge, or (3) that they

---

[12] Although Ransdell testified that she kept coaching notes for all of the staff she supervised, we have no evidence of the frequency of those coachings for other employees.

were insufficient to motivate discharge." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 728 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993) (emphases and quotation marks omitted). Regardless of which method the plaintiff employs to demonstrate pretext, she "bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the [defendant] intentionally discriminated against [her]." *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)); *Seeger v. Cincinnati Bell Tel. Co.*, LLC, 681 F.3d 274, 285 (6th Cir. 2012). Hughes asserts that she has shown that her termination had no basis in fact and was not actually motivated by the events of October 30-31, 2015.

"The first method is essentially an attack on the credibility of the employer's proffered reason." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006) (citations omitted). However, under the "honest belief rule" as adopted by the Sixth Circuit and as referenced by the Jefferson Circuit Court, an employer cannot be held liable "if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered

decision." *Ladd*, 552 F.3d at 503 (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008)). An employer may invoke the honest belief rule if it can show that it "reasonably rel[ied] on particularized facts before it at the time the decision was made." *Joostberns*, 166 F. App'x at 795 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). It is not enough for a plaintiff to show that the employer was mistaken or there is dispute "over the facts upon which the discharge was based." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001); *Seeger*, 681 F.3d at 285. "An employer's invocation of the honest belief rule does not automatically shield it, because the employee must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is 'too obvious to be unintentional.'" *Seeger*, 681 F.3d at 286 (quoting *Smith*, 155 F.3d at 807).

Hughes contends that Norton's stated reason is not based in fact, because she believes she was not in fact impaired on the night of October 31 and performed her job duties adequately. According to Hughes, Norton should have asked her to submit to a drug and alcohol test during the investigation, days after the event. However, it was not until over a day later that Hughes herself brought her misconduct and lackluster job performance to her supervisor's attention. Given that delay, it is reasonable that Norton did not request a drug test, especially because Norton's proffered rationale for termination is based upon Hughes's own

-31-

repeated admissions during the independent investigation. Hughes also asserts that Norton should have conducted interviews with other employees involved in the events of October 30-31. However, an employer is not required to conduct an "optimal" investigation and interview all possible witnesses. *Smith*, 155 F.3d at 807. Norton gave Hughes the opportunity to speak on her own behalf and placed great credence upon her personal account of the events in question.

It is undisputed that Hughes drank alcohol and took a known sedative while on-call on the night of October 31, 2015. Hughes herself admitted that she had consumed alcohol and Phenergan while on call and had "not been on her A-game" to Ransdell, Photiadis, and Goatley in the days following as well as under sworn oath. Goatley had no reason to disbelieve Hughes's own account of the events in question when she recommended termination, even though Hughes now claims she was not impaired. Although Norton's Drug and Alcohol Policy does not explicitly prohibit ANMs like Hughes from drinking alcohol while on-call, Norton's Corrective Action policy provides that an employee can be discharged "for work performance issues" and "[r]eckless, intentional acts or conduct detrimental to patient care . . . or hospital operations." Appellee's Br., Exhibit 1. Norton determined that Hughes's conduct was "egregious" in light of an ongoing hospital emergency and jeopardized patient safety and hospital operations. Viewing the evidence in the light most favorable to Hughes, we conclude that

Norton made a "reasonably informed and considered decision before taking an adverse employment action[,]" and, thus, Norton's honest belief defense stands. *Smith*, 155 F.3d at 807.

Hughes further asserts that Norton's reasons for terminating her employment were insufficient to justify termination because other employees in similar situations were not likewise disciplined. Not only must similarly situated employees share "nearly identical" employment situations, "[b]eing similarly situated also requires that the employees have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Commonwealth v. Solly*, 253 S.W.3d 537, 542 (Ky. 2008) (internal quotation marks and citations omitted); *see Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264 (6th Cir. 2007) (holding that even though two employees had broken rules regarding employee honesty, their circumstances were not sufficiently similar to infer pretext where one employee forged his employer's signature and the other lied about his job qualifications). As previously discussed, Hughes has not offered any evidence of any other Norton employees who admitted to drinking and taking prescription sedatives while on-call or were proven to have done so.

Although Hughes made numerous complaints regarding Norton's lack of preparedness for accreta cases, she has presented no evidence that she was

terminated for anything but Norton's proffered reasons.  Indeed, when Hughes was asked if she had anything, other than her own belief that she was terminated for her complaints, she could only say, "It's what I believe," and, "It just makes sense." Hughes's Dep. at 108.  Subjective belief is not evidence and cannot be used to overcome summary judgment.  *Seitz*, 796 S.W.2d at 3.  Hughes cannot simply rely upon her *prima facie* case to create a genuine issue of material fact; she must offer additional evidence of causal connection that would cause a reasonable jury to doubt Norton's explanation for termination.  *See Joostberns*, 166 F. App'x at 796. She has failed to do so.  Accordingly, we affirm the Jefferson Circuit Court's judgment.

### C. *Intentional Infliction of Emotional Distress*

The Kentucky Supreme Court first recognized the tort of intentional infliction of emotional distress in *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984), wherein it adopted the Restatement (Second) of Torts § 46(1):  "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm[.]"  *Craft*, 671 S.W.2d at 251.

In order to recover under Kentucky tort law, a plaintiff must provide *prima facie* evidence that (1) the defendant's conduct was intentional or reckless;

-34-

(2) the conduct was so outrageous and intolerable so as to offend generally accepted standards of morality and decency; (3) a causal connection exists between the conduct complained of and the distress suffered; and (4) the resulting emotional stress was severe. *Brewer v. Hillard*, 15 S.W.3d 1, 6 (Ky. App. 1999) (citing *Seitz*, 796 S.W.2d at 2-3). Because the absence of sufficient evidence of just one element is fatal to Hughes's claim, we limit our analysis to the element at issue: extreme and outrageous conduct.

"An action for outrage will not lie for 'petty insults, unkind words and minor indignities'; the action only lies for conduct which is truly 'outrageous and intolerable.'" *Id*. (quoting *Kroger Co. v. Willgruber,* 920 S.W.2d 61, 65 (Ky. 1996)). "Rather, it is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000). Mere termination, even termination based in discrimination, does not rise to the level of outrageous conduct required to support an intentional infliction of emotional distress claim. *Benningfield*, 183 S.W.3d at 572.[13]

---

[13] Hughes additionally claims that the employer-employee relationship between Norton and herself renders her termination outrageous. It is true that "[t]he existence of a special relationship between the parties can make conduct outrageous." *Osborne*, 31 S.W.3d at 914 (holding that the special, confidential relationship between a priest and his parishioner in combination with the priest's sexual affair with the parishioner's wife rose to the level of outrageous because the breach of the priest's independent duty of care); *Arlinghaus v. Gallenstein*, 115 S.W.3d 351, 353 (Ky. App. 2003) ("Several courts have found such a duty in the counseling relationship."). However, there is no Kentucky case law to suggest that an at-will

Although Hughes contends that Norton's action was not "mere termination" but "an effort to destroy a significant and distinguished career," there is no evidence to support such allegations. Appellant's Br. at 24. In fact, upon her discharge, Hughes was told that she was eligible for re-hire, and two Norton doctors gave her references that enabled her to obtain employment as a nurse by January 4, 2016. Norton's decision to terminate Hughes, regardless of whether its reasoning was pretextual, does not qualify as "extreme and outrageous conduct" as required to sustain a claim for intentional infliction of emotional distress. We agree with the circuit court's holding and affirm summary judgment on this claim.

## IV. CONCLUSION

In light of the foregoing, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings in accordance with this opinion.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Callie Walton<br>Louisville, Kentucky | Jared Cox<br>Aaron Marcus<br>Louisville, Kentucky |

---

employer-employee relationship creates a "special relationship" for the purpose of an intentional infliction of emotional distress claim.